UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LM INSURANCE CORPORATION,
LIBERTY MUTUAL FIRE INSURANCE COMPANY,
LIBERTY MUTUAL PERSONAL INSURANCE COMPANY,
LM GENERAL INSURANCE COMPANY,
AMERICAN STATES INSURANCE COMPANY,
LIBERTY COUNTY MUTUAL INSURANCE COMPANY, and
WAUSAU UNDERWRITERS INSURANCE COMPANY,

C.A. No.:

Plaintiffs,

v.

SINGH PT PLLC,
GURPREET SINGH AHUJA, P.T.,
TRINITY MEDICAL HEALTHCARE SERVICES P.C., and
PAULA MAUDE CHARISSE BROWN, M.D.,

Defendants.

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

The plaintiffs, LM Insurance Corporation, Liberty Mutual Fire Insurance Company,

Liberty Mutual Personal Insurance Company, LM General Insurance Company, American States

Insurance Company, Liberty County Mutual Insurance Company, and Wausau Underwriters

Insurance Company (collectively, "Liberty Mutual" and/or "plaintiffs"), by their attorneys, King,

Tilden, McEttrick & Brink, P.C., allege as follows:

1.     This case involves a scheme to defraud Liberty Mutual executed by a physical

therapist, Gurpreet Singh Ahuja, P.T. ("Ahuja") and his professional corporation ("PC"), Singh

PT PLLC ("Singh PLLC"), who conspired with Paula Maude Charisse Brown, M.D. ("Brown")

and her PC, Trinity Medical Healthcare Services P.C. ("Trinity Medical"), to (1) allow Ahuja the

illegal use and control of Trinity Medical; (2) submit bills pursuant to an unlawful referral and

1

kickback arrangement; (3) submit bills for services not rendered; and (4) submit bills for unnecessary healthcare services at grossly excessive charges in violation of state and local licensure law.

2.    The crux of the scheme involved an unlawful (but absolutely necessary) referral scheme that allowed Ahuja to bill Liberty Mutual for physical therapy services.

3.    Trinity Medical and Brown were used to write prescriptions to Ahuja for unnecessary physical therapy services, many of which were never actually rendered.

4.    The scheme was primarily carried out at 94-13 120th Street, Suites 1 and 2, South Richmond Hills (Queens), New York 11419 ("94-13 120th Street Clinic"), where Singh PLLC leased space and coincidentally "subleased" space to Trinity Medical and Brown to disguise the illegal siphoning of No-Fault proceeds as "rent" in violation of New York law.

5.    Trinity Medical was purposely used to circumvent New York law and its strong prohibition against what is known, colloquially, as the illegal corporate practice of medicine.

6.    In New York, the illegal corporate practice of medicine occurs when a physician is represented to the public as the sole officer, director, and shareholder of a PC, yet the PC is actually owned, operated and controlled by laypersons who are not licensed or authorized to practice medicine or derive financial benefit from the delivery of professional medical services.

7.    In schemes like this, the laypersons disguise their control of the PCs through various means with the goal of siphoning-off the PCs' professional fees and profits, which are generated through the delivery of healthcare services to patients.

8.    Layperson control over medical PCs is prohibited in New York because when physicians are beholden to non-physicians, the desire to generate profits is placed ahead of patient care, which creates an ethical conflict and undermines the quality of care.

9.      New York is an ideal venue for schemes like these because every automobile owner is required to purchase insurance, and every insurance company is required to provide coverage of up to $50,000.00 per person for reasonable, accident-related medical expenses.

10.      In this case, the defendants' scheme was propelled, in part, by the illegal ownership and control of Trinity Medical.

11.      As set out below, Ahuja controlled and profited from the operation of Trinity Medical.

12.      At all relevant times, Trinity Medical was used as a vehicle to bill for an array of testing and treatments that were medically unnecessary, excessive, and clinically worthless and many of which were never performed.

13.      Ahuja's position of control allowed him to (a) direct patient care; (b) ensure the delivery of a high frequency of tests and treatments to patients of Trinity Medical; and (c) guide the referral of patients to his physical therapy clinic—Singh PLLC.

14.      Trinity Medical entered into a "sublease" agreement with Singh PLLC, pursuant to which Trinity Medical "rented" space.

15.      This "sublease" agreement is, in fact, a covert method of funneling professional profits to Singh PLLC in exchange for access to its patient base and referral network.

16.      As explained herein, throughout the course of this scheme, the Defendants (or those working under their direction and control) intentionally induced Liberty Mutual to pay the Provider Defendants[1] for excessive and medically unnecessary treatment and tests purportedly provided to Liberty Mutual Claimants pursuant to unlawful referral agreements while knowing that the charges for the treatment and tests were not compensable under New York law.

---

[1] The term "Provider Defendants" shall mean Singh PLLC and Trinity Medical as defined herein.

17.     These No-Fault benefit claims were not compensable under New York law because (a) Trinity Medical was not legally formed or operated in accordance with New York law; (b) the Defendants billed for treatment and tests pursuant to unlawful referrals; (c) the Provider Defendants fraudulently billed for treatment and tests that were not performed as described; (d) the Provider Defendants billed for medically unnecessary and excessive treatment; and/or (e) the Provider Defendants fraudulently billed at excessive rates.

18.     As detailed below, the success of this scheme relied on a large base of patients who were eligible to seek medical expense coverage under New York's No-Fault laws.

19.     Indeed, the Provider Defendants' patients were persons who were allegedly injured in automobile accidents and therefore eligible for No-Fault coverage under an insurance policy issued by Liberty Mutual (i.e., "Claimants").

20.     As part of this scheme, Liberty Mutual Claimants were made to enter into assignment of benefit agreements with the Provider Defendants, which gave these entities the right to seek payments directly from Liberty Mutual—payments that were funded using the Claimants' available No-Fault insurance coverage.

21.     Following the execution of these assignment of benefit agreements, the Provider Defendants billed Liberty Mutual for a battery of treatment and tests to Liberty Mutual Claimants.

22.     The Provider Defendants then sought and collected No-Fault benefit payments directly from Liberty Mutual.

23.     The success of the Defendants' scheme to defraud relied on the transmission to Liberty Mutual, through the U.S. Mail, of invoices, bills, and other No-Fault claim reimbursement documents warranting the Provider Defendants' eligibility to collect No-Fault benefits under New York law.

24.     The Defendants reaped their unlawful financial gains by causing the Provider Defendants to use the U.S. Mail to transmit their treatment records, bills, and other insurance claim documents to Liberty Mutual.

25.     The records and bills mailed to Liberty Mutual warranted that the Provider Defendants were eligible to seek and collect No-Fault benefits from Liberty Mutual as assignees of the Claimants.

26.     Liberty Mutual reasonably relied on the facial validity of the records and bills mailed by the Provider Defendants—and the representations contained therein—when making No-Fault benefit payments to the Provider Defendants.

27.     However, these No-Fault benefit claims were false and fraudulent—and the Defendants knew it—because the records and bills contained material misrepresentations concerning the Provider Defendants' right to be paid under New York's No-Fault laws.

28.     As set out below, the Provider Defendants were never eligible to seek or collect No-Fault benefit payments from Liberty Mutual for the following reasons:

a.   Trinity Medical was unlawfully operated, managed, and controlled by one or more individuals not lawfully authorized to (i) provide medical services, (ii) own or control a professional medical service corporation, or (iii) profit from a professional medical service corporation organized to provide medical services;

b.   Trinity Medical was purposefully caused to split its professional fees and profits with non-physicians;

c.   The Provider Defendants billed Liberty Mutual for treatment and tests that were made pursuant to unlawful referrals;

d.   The Provider Defendants billed Liberty Mutual for treatment and tests that were not performed as described;

e.   The Provider Defendants billed Liberty Mutual for treatment and tests that were medically unnecessary and excessive; and

      f.  The Provider Defendants billed Liberty Mutual for treatment and tests that were fraudulently billed at excessive rates.

29.    By this Complaint, Liberty Mutual brings this action against the Defendants for (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common law fraud; and (c) unjust enrichment.

30.    This action seeks actual damages of more than $1,466,761.60, which represent No-Fault benefit payments that Liberty Mutual was wrongfully caused to make to the Provider Defendants during the course of this scheme.

31.    Liberty Mutual also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to pay or reimburse the Provider Defendants (or their agents) in connection with any past, present or future No-Fault benefit claims that have been submitted to Liberty Mutual because: (a) Trinity Medical was unlawfully operated, managed, and controlled by one or more individuals not lawfully authorized to (i) provide medical services, (ii) own or control a professional medical service corporation, or (iii) profit from a professional medical service corporation organized to provide medical services; (b) Trinity Medical was purposefully caused to split its professional fees and profits with non-physicians; (c) the Provider Defendants billed Liberty Mutual for treatment and tests that were made pursuant to unlawful referrals; (d) the Provider Defendants billed Liberty Mutual for treatment and tests that were not performed as described; (e) the Provider Defendants billed Liberty Mutual for treatment and tests that were medically unnecessary and excessive; and (f) the Provider Defendants billed Liberty Mutual for treatment and tests that were fraudulently billed at excessive rates.

32.    Each Defendant named herein conspired with at least one other Defendant to accomplish and to further the objectives of this scheme to defraud.

33.    Liberty Mutual estimates that the Defendants purposely submitted to Liberty

Mutual hundreds of bills on behalf of the Provider Defendants knowing that none of the bills were lawfully compensable under prevailing New York law relative to No-Fault insurance coverage and reimbursement eligibility.

## I.     THE PARTIES

### A.     PLAINTIFFS

34.     Liberty Mutual Personal Insurance Company is duly organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business in Boston, Massachusetts. Liberty Mutual Personal Insurance Company is authorized to conduct business in the State of New York.

35.     Liberty County Mutual Insurance Company is duly organized and existing under the laws of the State of Texas with its principal place of business in Boston, Massachusetts. Liberty County Mutual Insurance Company is authorized to conduct business in the State of New York.

36.     Liberty Mutual Fire Insurance Company and Wausau Underwriters Insurance Company are companies duly organized and existing under the laws of the State of Wisconsin with their principal place of business in Boston, Massachusetts. Liberty Mutual Fire Insurance Company and Wausau Underwriters Insurance Company are authorized to conduct business in the State of New York.

37.     LM Insurance Corporation and LM General Insurance Company are companies duly organized and existing under the laws of the State of Illinois with their principal place of business in Boston, Massachusetts. Liberty Insurance Corporation and LM General Insurance Company are authorized to conduct business in the State of New York.

38.     American States Insurance Company is duly organized and existing under the laws of the State of Indiana with its principal place of business in Boston, Massachusetts. American States Insurance Company is authorized to conduct business in the State of New York.

B.     **DEFENDANTS**

1.     **Singh PT PLLC**

39.     Singh PLLC is organized under New York law as a professional limited liability company.

40.     Singh PLLC maintains its principal place of business at 94-13 120th Street, Suites 1 and 2, South Richmond Hill, NY 11419.

41.     According to records on file with the New York Office of Professions, Ahuja is the sole shareholder, officer, and/or director of Singh PLLC.

42.     At all relevant times, Ahuja, Brown, and Trinity Medical participated in the operation and management of Singh PLLC by ensuring Singh PLLC obtained unlawful referrals from Trinity Medical to allow the Defendants to bill for unnecessary treatment and tests.

43.     Because Singh PLLC engaged in illegal billing pursuant to unlawful referrals to provide unnecessary treatment at grossly excessive fees, Singh PLLC was operated in direct violation of N.Y. state and local licensure laws, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

2.     **Gurpreet Singh Ahuja, P.T.**

44.     Ahuja resides in and is a citizen of the State of New York.

45.     At all relevant times, Ahuja has been licensed to practice physical therapy in the State of New York.

46.     According to records on file with the New York Office of Professions, Ahuja is the

sole shareholder, officer, and/or director of Singh PLLC.

47.    At all relevant times, Ahuja directed Singh PLLC, Trinity Medical, and Brown to make unlawful referrals to Singh PLLC to provide excessive and medically unnecessary healthcare services to Liberty Mutual Claimants.

48.    When patients sought treatment from Singh PLLC, they were caused to enter into assignment of benefits agreements with Singh PLLC, thus giving Singh PLLC the right to seek No-Fault payments directly from insurers.

49.    As an assignee of its patients' benefits, Singh PLLC sought and collected No-Fault benefit payments directly from insurers, including Liberty Mutual.

50.    As detailed herein, the Defendants purposely sought No-Fault benefit payments from Liberty Mutual knowing that Singh PLLC was not lawfully eligible to seek or collect such payments based upon the unlawful referral scheme to provide unnecessary physical therapy services.

51.    As detailed below, Ahuja participated in the operation and management of the Singh PLLC and Trinity Medical enterprises by entering into lease and/or sublease agreements to obtain unlawful referrals to Singh PLLC to allow it to bill for unnecessary treatment and tests.

52.    Because he directly participated in the operation and management of the Singh PLLC and Trinity Medical enterprises during the course of this scheme, Ahuja is responsible for the fraudulent healthcare services that were purportedly rendered, and is also jointly and severally liable for the payments that Liberty Mutual was wrongfully induced to make to the Provider Defendants.

### 3.    Trinity Medical Healthcare Services P.C.

53.    Trinity Medical is organized under New York law as a professional corporation.

54.    Trinity Medical maintains its principal place of business at 1345 Sixth Avenue, 2nd Floor, New York, NY 10105.

55.    According to records on file with the New York Office of Professions, Brown is the sole shareholder, officer, and/or director of Trinity Medical.

56.    At all relevant times, Brown participated in the operation and management of Trinity Medical.

57.    As detailed below, Brown participated in the operation and management of the Singh PLLC and Trinity Medical enterprises by entering into lease and/or sublease agreements to provide unlawful referrals to Singh PLLC to allow the Defendants to bill for unnecessary treatment and tests.

58.    Brown was the signatory on Trinity Medical documentation for billing for services it rendered and/or unnecessary medical services.

59.    Ahuja participated in the operation and management of the Trinity Medical enterprise by (1) illegally owning and operating Trinity Medical; and (2) by demanding unlawful physical therapy referrals.

60.    Because Trinity Medical was unlawfully owned and operated by Ahuja, Trinity Medical was operated in direct violation of N.Y. Bus. Corp. Law § 1508, and was therefore never lawfully entitled to seek or collect No-Fault benefit payments pursuant to N.Y. Ins. Law § 5102.

### 4.    Paula Maude Charisse Brown, M.D.

61.    Brown resides in and is a citizen of the State of New York.

62.    At all relevant times, Brown has been licensed to practice medicine in the State of New York.

63.    According to records on file with the New York Office of Professions, Brown is

the sole shareholder, officer, and/or director of Trinity Medical.

64.     During the relevant period, Ahuja—not Brown—unlawfully owned, operated, and controlled Trinity Medical.

65.     At all relevant times, Ahuja directed Brown to make unlawful referrals for fraudulent physical therapy services to Liberty Mutual Claimants using Trinty Medical.

66.     When patients sought physical therapy services from Trinity Medical, they were caused to enter into assignment of benefits agreements with Trinity Medical, thus giving Trinity Medical the right to seek No-Fault payments directly from insurers.

67.     As an assignee of its patients' benefits, Trinity Medical sought and collected No-Fault benefit payments directly from insurers, including Liberty Mutual.

68.     As detailed herein, the Defendants purposely sought No-Fault benefit payments from Liberty Mutual knowing that Trinity Medical was not lawfully eligible to seek or collect such payments.

69.     Because Brown directly participated in the operation and management of the Singh PLLC and Trinity Medical enterprises during the course of this scheme, Brown is responsible for the fraudulent healthcare services that were purportedly rendered, and is also jointly and severally liable for the payments that Liberty Mutual was wrongfully induced to make.

## II.     <u>JURISDICTION AND VENUE</u>

70.     Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331.

71.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

72.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of

acts known to Liberty Mutual alleged herein were carried out within the Eastern District of New York.

73.    The Provider Defendants conducted business in the State of New York by submitting bills under New York's No-Fault laws for healthcare services that were purportedly provided to patients who lived in New York or who were covered by New York automobile insurance policies issued by Liberty Mutual.

74.    The Defendants have therefore engaged in purposeful activities in New York by conducting business in New York.

75.    The Defendants have also engaged in purposeful activities in New York by causing the Provider Defendants to initiate arbitration proceedings in New York against Liberty Mutual.

76.    The Defendants' activities in and contact with New York were purposely sought and transacted to take advantage of the benefits available under the No-Fault laws.

77.    The allegations and causes of action asserted herein arise from the Defendants' conduct within the State of New York, and their purposeful availment of New York's No-Fault insurance system, and therefore there is no question that there exists a substantial relationship between the transactions at issue, and Liberty Mutual's causes of action.

78.    Overall, the fraudulent scheme alleged herein has many ties to the State of New York, and the ends of justice are best served through this Court's exercise of jurisdiction over the Defendants.

## III.    APPLICABLE NO-FAULT LAWS AND LICENSING STATUTES

### A.    NEW YORK'S NO-FAULT LAWS AND REGULATIONS

79.    Liberty Mutual underwrites automobile insurance in the State of New York.

80.    New York's No-Fault laws are designed to ensure that injured victims of motor

vehicle accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services.

81.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq.*), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq.*) (collectively, "the No-Fault laws"), automobile insurers are required to provide Personal Injury Protection Benefits (hereinafter, "No-Fault benefits") to Liberty Mutual Claimants.

82.     Under New York No-Fault law, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

83.     "Basic economic loss" is defined to include "all necessary expenses" for medical services. N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

84.     No-Fault benefits include up to $50,000.00 per Liberty Mutual Claimant for reasonable expenses that are incurred for necessary healthcare goods and services.

85.     A patient can assign their No-Fault benefits to healthcare service providers.

86.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered, using the claim form required by the New York State Department of Financial Services formerly known as the New York State Department of Insurance ("DOI") (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3").

87.     Alternatively, healthcare providers may submit claims to insurance carriers using the Health Insurance Claim Form (known as the "CMS-1500" form and formerly known as the "HCFA-1500" form).

88.     The NF-3 and CMS-1500 forms are important documents in the insurance industry. They certify that the provider's request for payment is not materially false, misleading, or fraudulent. 11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

89.     Pursuant to N.Y. Ins. Law § 403(d), each NF-3 and CMS-1500 form carry the same warning by substance: "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent act, which is a crime."

90.     A healthcare provider makes a material misrepresentation when it submits an NF-3 or CMS-1500 form that either omits or misrepresents material information about the provider's eligibility to seek or collect payment under New York's No-Fault laws.

91.     It is a material misrepresentation to submit NF-3 and CMS-1500 forms for treatment, tests, DME equipment, prescription drugs, and services that: (a) are never provided; (b) are billed in violation of state and local licensure law; (c) not medically necessary; or (d) are billed at a greater monetary charge than is permitted by the applicable Fee Schedule.

92.     Under New York law, a provider of healthcare services is not eligible for No-Fault reimbursement if the provider fails to meet **any** applicable New York state or local licensing requirement necessary to perform such service in New York, **or** if the provider fails to meet **any** licensing requirement necessary to perform the service in any other state in which the service is performed. 11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

93.     Accordingly, if a professional healthcare service provider fails to meet any applicable licensing requirement necessary to perform a service, then the provider is not lawfully entitled to seek or collect No-Fault benefits under New York's No-Fault laws.

94.    As alleged herein, the Defendants failed to comply with several laws and regulations when providing healthcare services to claimants during the course of this scheme; therefore, the Defendants are not—and never were—eligible to seek or collect No-Fault benefits from Liberty Mutual.

95.    A healthcare provider makes a material misrepresentation when it submits an NF-3 form that either omits or misrepresents material information about the provider's eligibility to seek or collect payment under New York's No-Fault laws.

96.    A healthcare provider's omission or misrepresentation of material facts can take many forms, including false or misleading information about (a) the ownership of a PC seeking payment, or (b) the identity of the actual provider of the service.

97.    A healthcare provider's representations about PC ownership and control are material because under New York law only a licensed physician can (a) practice medicine, (b) own and control a PC organized to practice medicine, (c) employ and supervise other physicians, and (d) derive economic benefit from the delivery of physician services (absent limited exceptions not applicable here).

98.    Likewise, a medical provider's representations about the actual provider of the billed-for services are material because under New York law a medical provider operating as a PC is only eligible for compensation if the billed-for services are provided by an owner or employee of the PC.

99.    If a PC uses independent contractors, instead of employees, to provide medical services, then the PC is not eligible to seek or collect payment under New York's No-Fault laws.

100.    It is a material misrepresentation to submit NF-3 forms for treatment, tests, and services that (a) are never provided; or (b) are billed as expensive/complex procedures when, in

reality, a less complex and less expensive service are actually provided.

**B.    CONTROL OF PROFESSIONAL SERVICE CORPORATIONS**

101.    New York's No-Fault Laws expressly provide that "[a] provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

102.    New York Business Corporation Law § 1504 provides that no professional service corporation may render professional services except through individuals authorized by law to render such professional services.

103.    New York Business Corporation Law § 1507 prohibits a professional service corporation from issuing shares to individuals unless they are "engaged in the practice of such profession in such a corporation." It also prohibits such shareholder(s) from entering into any agreement, granting proxies, or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice.

104.    Pursuant to New York Business Corporation Law § 1508, no individual may be a director or officer of a professional service corporation unless he is authorized by law to practice in this state a profession that such corporation is authorized to practice.

105.    Under New York Education Law § 6530(19), it is professional misconduct for a licensed physician to permit any person to share in the fees for professional services, other than a partner, employee, associate of a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

106.    Under New York Education Law § 6530, it is also professional misconduct for a

16

licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatments not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

107.    Moreover, for a provider of healthcare services to be eligible to bill for and collect charges from an insurer for healthcare services pursuant to N.Y. Ins. Law § 5102(a), it must be the actual provider of the service. Under the No-Fault laws, a professional service corporation is not eligible to bill or collect for services that were rendered by persons who are not direct employees of the professional service corporation, such as independent contractors.

108.    In New York, insurers are not precluded from seeking affirmative recovery against individuals and entities that have violated the above statutes and regulations.

109.    In *State Farm Mut. Auto. Ins. Co. v. Mallela*, 827 N.E.2d 758 (N.Y. 2005), the New York Court of Appeals upheld 11 N.Y.C.R.R. § 65-3.16(a)(12) by holding that corporations organized and registered to provide professional healthcare services that are fraudulently incorporated under New York Business Corporations Law §§ 1507 and 1508 and New York Education Law § 6507(4)(c) (i.e., those corporations that are operated and/or controlled by individuals or entities not licensed or authorized to provide the professional healthcare services that the corporations are organized and registered to provide) are not entitled to No-Fault reimbursement.

110.    When determining a medical provider's reimbursement eligibility under New York's No-Fault laws, insurers are allowed to "look beyond the face of licensing documents to identify willful and material failure to abide by state and local law," such as actual ownership of the practice by an unlicensed individual. *Mallela*, 827 N.E.2d at 761.

111.    The New York Court of Appeals made clear that *Mallela* does not require a finding

of fraud for an insurer to withhold payments to a medical service corporation improperly controlled by non-physicians." *Andrew Carrothers, M.D., P.C. v. Progressive Ins. Co.*, 128 N.E.3d 153, 163 (N.Y. 2019) ("A corporate practice that shows 'willful and material failure to abide by' licensing and incorporation statutes may support a finding that the provider is not an eligible recipient of reimbursement under 11 N.Y.C.R.R. § 65-3.16(a)(12) without meeting the traditional elements of common-law fraud." (internal citations omitted)).

112.    In the matter *Metroscan Imaging, P.C. v. GEICO Ins. Co.*, 823 N.Y.S.2d 818, 821-822 (N.Y. App. Term, 2d Dep't 2006), the court held that an insurer may maintain a cause of action against a fraudulently incorporated medical provider to recover monies paid on or after April 5, 2002 (the effective date of 11 N.Y.C.R.R. § 65-3.16(a)(12)).

113.    Moreover, in terms of the fees charged by healthcare providers, the New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule").

114.    The Fee Schedule is used by healthcare providers and insurers to determine the level of reimbursement payable on legitimate claims.

115.    Under Insurance Law § 5102(a)(1), the term "basic economic loss" covers "all necessary expenses incurred for…medical…surgical…physical therapy…[and] any other professional health services."

116.    In determining basic economic loss, the expenses incurred under Insurance Law § 5102(a)(1) "shall be in accordance with the limitations" of Insurance Law § 5108.

117.    Pursuant to Insurance Law § 5108(b), the Superintendent of Insurance "shall promulgate rules and regulations implementing and coordinating the provisions of [the No-Fault laws] and the workers' compensation law with respect to the charges for the professional health

services specified" in Insurance Law § 5102(a)(1), "including the establishment of schedules for all such services for which schedules have not been prepared and established by the chairman of the workers' compensation board."

118. As detailed below, the Defendants violated one or more of these New York statutes and regulations through the operation and management of the Provider Defendants.

C. **NEW YORK LAWS APPLICABLE TO PROFESSIONAL HEALTHCARE SERVICE PROVIDERS**

119. Additionally, New York's Education Law and Business Corporation Law also apply to professional healthcare providers, such as individual licensees and professional service enterprises.

120. Under New York Education Law § 6530, it is professional misconduct for a licensed physician to (a) practice the profession fraudulently, (b) order excessive tests or treatment not warranted by the condition of the patient, and (c) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient.

121. Moreover, New York law prohibits physicians from taking advantage of their patients for their own or someone else's financial gain, such as through accepting fees in exchange for referrals or promoting the sale of certain services or goods.

122. Specifically, New York Education Law § 6530(18) provides that professional misconduct for physicians includes "[d]irectly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services."

123. Further, a physician engages in professional misconduct in "[e]xercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third

party." N.Y. Educ. Law § 6530(17).

124.    Similarly, section 6531 provides for an additional definition of professional misconduct for physicians in the case where a physician "has directly or indirectly requested, received or participated in the division, transference, assignment, rebate, splitting, or refunding of a fee for, or has directly requested, received, or profited by means of a credit or other valuable consideration as a commission, discount or gratuity, in connection with the furnishing of professional care or service, including…physiotherapy or other therapeutic service or equipment…[or] orthopedic or surgical appliances or supplies…or any other goods, services, or supplies prescribed for medical diagnosis, care, or treatment under this chapter[.]" N.Y. Educ. Law. § 6531.

**D.     NEW YORK WORKERS' COMPENSATION FEE SCHEDULE**

125.    In terms of the fees charged by healthcare providers, the New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("NY Fee Schedule").

126.    The NY Fee Schedule is used by healthcare providers and insurers to determine the level of reimbursement payable on legitimate claims.

127.    The purpose of the NY Fee Schedule is to: (a) provide comprehensive billing guidelines to allow healthcare providers to appropriately describe their services and minimize disputes over reimbursement through the establishment of maximum permissible fees that can be charged for services included in the Fee Schedule; and (b) set limits on charges that can be advanced by healthcare service providers to protect claimants from having their medical benefit limits artificially eroded by excessive fees.

128.    Under Insurance Law § 5102(a)(1), the term "basic Economic loss" covers "all

necessary expenses insured for…medical, hospital…, surgical…[and] any other professional health services."

129.    In determining basic economic loss, the expenses incurred under Insurance Law § 5102(a)(1) "shall be in accordance with the limitations" of Insurance Law § 5108.

130.    Pursuant to Insurance Law § 5108(b), the Superintendent of Insurance "shall promulgate rules and regulations implementing and coordinating the provisions of [the No-Fault las] and the workers' compensation law with respect to the charges for the professional health services specified" in Insurance Law § 5102(a)(1), "including the establishment of schedules for all such services for which schedules have not been prepared and established by the chairman of the workers' compensation board."

131.    Insurance Law § 5108(a) also provides that the "charges for services specified in" Insurance Law § 5102(a)(1) "shall not exceed the charges permissible under the schedule prepared and established by the chairman of the workers' compensation board." *See also* 11 N.Y.C.R.R. § 65-3.16(a)(1) ("Payment for medical expenses shall be in accordance with fee schedules promulgated under section 5108 of the Insurance Law…").

**E.    NEW YORK LAW REGARDING SELF-REFERRALS**

132.    The Public Health Laws prohibit certain financial arrangements between health care providers to protect against potential abuse, particularly in circumstances in which referrals may be driven by profit rather than by medical necessity of patient care. *See* N.Y. Pub. Health L. § 238-a(5)(b)(vii); *see also Cambridge Med., P.C. v. Allstate Ins. Co.*, 899 F. Supp. 2d 227, 232 (E.D.N.Y. 2012).

133.    Where a referral is made in violation of the Public Health Laws, "neither the referring provider nor the provider of the service are entitled to payment from a third-party

insurer." *Cambridge Med.*, 899 F. Supp. at 232.

134.    When a healthcare provider refers a patient to another provider or facility in which the referring provider, or their immediate family member, has a financial relationship, such a referral creates the risk of unnecessary services because the provider's own financial motivations might be placed ahead of the actual needs of the patient, thereby raising healthcare costs and subjecting patients to unnecessary care.

135.    To control the risks posed by such self-referrals, New York Public Health Law § 238-a prohibits certain healthcare service providers from referring patients to another healthcare service provider (or to an immediate family member of the provider) for certain services where a financial relationship exists between the providers.

136.    "Financial relationship" is defined by the statute as "an ownership interest, investment interest, or compensation arrangement." *See* N.Y. Pub. Health Law § 238(3); 10 N.Y.C.R.R. § 34-1.2(c); *see also* N.Y. Pub. Health Law § 238-a(3) (defining ownership interest or investment interest).

137.    New York Public Health Law § 238-d pertains to practitioner disclosure requirements for certain referrals that are not prohibited by, or subject to an exception under, section 238-a. *See also* 10 N.Y.C.R.R. § 34-1.5(a).

138.    Section 238-d(1)(a) prohibits a practitioner from making "a referral to a health care provider for the furnishing of any health or health related items or services where such practitioner or immediate family member of such practitioner has…an ownership or investment interest…with such health care provider" without disclosing the financial relationship to the patient. *See also* 10 N.Y.C.R.R. § 34-1.5(a)(1).

139.    Section 238-d(2) requires that the disclosure "provide notice of any such financial

relationship and shall also inform the patient of his or her right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available." *See also* 10 N.Y.C.R.R. § 34-1.5(b).

140.    The applicable regulations prescribe the form that the disclosure must take and also require that the disclosure "be posted prominently in the practitioner's office." *See* 10 N.Y.C.R.R. § 34-1.5(b); 10 N.Y.C.R.R. § 34-1.6.

141.    Accordingly, if a referral is subject to section 238-d and the disclosure requirement is not met, then the provider has failed to comply with applicable licensing regulations and is therefore ineligible to collect No-Fault payments.

## IV.    FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

### A.    GENERAL OVERVIEW OF DEFENDANTS' SCHEME TO DEFRAUD LIBERTY MUTUAL

142.    The Defendants intentionally engaged in conduct to defraud Liberty Mutual through the submission of false and fraudulent No-Fault benefit claims.

143.    New York's No-Fault system is designed to provide patients and healthcare providers with compensation for the provision of healthcare services and is also designed to facilitate prompt payment of patient claims.

144.    As a result, the submission of facially valid bills by healthcare service providers for patient services will often result in prompt payment from a No-Fault insurer.

145.    As it applies to professional healthcare services provided in the State of New York, healthcare providers are not eligible to seek or receive No-Fault reimbursement under Insurance Law § 5102 if they fail to meet ***any*** New York state or local licensing requirement necessary to perform such services in New York.

146.    The Defendants were well aware of these conditions of reimbursement when they

decided to take advantage of New York's No-Fault system and defraud Liberty Mutual by creating and controlling multiple entities that provided healthcare services to patients (i.e., Trinity Medical).

147.    By virtue of his nominal ownership of Trinity Medical, Ahuja was able to engage in the following misconduct as a means to propel this scheme:

- Billing Liberty Mutual for medically unnecessary treatment and tests that were not rendered as billed;

- Siphoning revenue from Trinity Medical—revenue that was generated from the provision of healthcare services to patients of Trinity Medical; and

- Devising unlawful referral arrangements among the Provider Defendants, which allowed Trinity Medical to pay kickbacks to Singh PLLC in exchange for patient referrals.

148.    The fraudulent services were not medically necessary, and were provided pursuant to a predetermined treatment protocol designed to maximize the reimbursement collected by the Provider Defendants, rather than to benefit patients.

149.    This allowed the Provider Defendants to submit disproportionately high bills to Liberty Mutual for unnecessary and excessive medical services.

150.    At all times relevant to this action, the Defendants ensured a steady patient base at each of the Provider Defendants by entering into a fraudulent "sublease" agreement with Ahuja and Singh PLLC at the 94-13 120th Street Clinic.

151.    Ahuja unlawfully controlled Trinity Medical.

152.    Ahuja devised a scheme to control Trinity Medical that operated from the 94-13 120th Street Clinic for the specific purpose of providing medically unnecessary healthcare treatments and tests.

153.    The scheme allowed Ahuja to accomplish his main objective of this scheme, which

was to take advantage of the generous benefits available under New York's No-Fault insurance laws.

154.    By recruiting Brown, Ahuja caused Trinity Medical's licensing credentials to create the false impression that the entities were owned and operated by qualified licensees.

155.    In reality, Ahuja was the true beneficiary and decision maker for Trinity Medical.

156.    As an unlicensed layperson, Ahuja is prohibited under New York law from owning, controlling, or profiting from medical profession corporations organized under New York laws to provide professional medical services (like Trinity Medical).

157.    To conceal his control over, and profits from, Trinity Medical, Ahuja, through Singh PLLC, utilized lease agreements that purported to rent office space at the 94-13 120th Street Clinic.

158.    These layers of lease agreements were intentionally crafted as a means to conceal Ahuja's control over Trinity Medical and his unlawful splitting of professional fees and profits collected by Trinity Medical in violation of New York law, by disguising the payments—which represented the professional fees and profits of Trinity Medical—as "rent," which was transferred to Singh PLLC for Ahuja's personal benefit.

159.    Singh PLLC subleases office space to Trinity Medical at the 94-13 120th Street Clinic.

160.    Through his position of power at the 94-13 120th Street Clinic, Ahuja controlled the operation and management of Trinity Medical enterprise through a pattern of mail fraud racketeering activity.

161.    Trinity Medical did not establish their own practice, but "leased" space at the 94-13 120th Street Clinic with a pre-existing patient base, which was generated and controlled by Ahuja.

162.    Trinity Medical did nothing to advertise or market their services to the general public.

163.    Despite failing to market the services, Trinity Medical enjoyed the steady flow of patients at the 94-13 120th Street Clinic upon subleasing space from Ahuja through Singh PLLC.

164.    Trinity Medical and Singh PLLC shared employees.

165.    True and accurate excerpts from testimony of Ahuja are contained below:

```
    Q      And you, sir, do you take a draw
or are you a K-1 owner?
    A      I am not technically K-1 owner.
Like, I don't get any money from the
company.
        Company paid expenses on
day-to-day basis, and there's no salary or
any compensation from the company.
```

```
Q       Let's back up a little bit.
        What are the names of your
employees?
    A       First, Jagroop Singh.  G for
Georgia [sic], A for apple, G for Georgia,
R for Robert, O for orange, O for orange,
P for Peter, Singh, S-I-N-G-H.
    Q       Jagroop.  What does Jagroop do?
    A       He helps with the admin work and
billing.
    Q       Next?
    A       Navjot Kaur.  N for Nancy, A for
```

```
        What does Navjot do?
    A       Navjot helps me with the patient
preparation area as a P.T. aide.
```

```
    Q       So Jagroop works for you alone?
    A       Yes.  And he works for someone
else, too.
    Q       Who?
    A       Dr. Brown.
```

```
    Q       I'm asking if you know Dr. Brown
and who Dr. Brown is.
    A       Dr. Brown, a medical doctor in
my office who leases space from me.
```

```
    Q       Does Navjot work for anybody
else?
    A       Yes, for Dr. Paula Brown.
```

166.    True and accurate excerpts from testimony of Brown are contained below:

```
    Q       So outside of Paula Brown, M.D.,
who else is employed by Trinity?
```

```
    A       Robert Mizell.
```

```
    A       Christiana T-A-N-O-A-H, probably
I think that's the spelling, Navi Singh,
N-A-V-I, S-I-N-G-H, and myself.
```

```
    Q      And Navi is a front desk person
at what location?
    A      Queens.
```

```
    Q      You hired Navi for one day a
week?
    A      Yes.  For that particular site,
yes.
    Q      So that's the site on 120th
Street --
    A      Right.
    Q      -- in Queens?
    A      Mm-hmm.
```

167.    The employees shared by Singh PLLC and Trinity Medical are relatives of Ahuja.

168.    True and accurate excerpts from testimony of Ahuja are contained below:

```
    Q      Now, let's go through this real
quick.
           Jagroop -- just for -- to start,
```

```
Jagroop and Jaskaran, they share the same
last name as you; are they relatives of
yours?
    A       Jagroop Singh is my nephew.
```

169.    Ahuja refused to let Brown refer for certain services while working out of the 94-13 120th Street Clinic.

170.    True and accurate excerpts from testimony of Brown are contained below:

```
    Q       And you crossed it out because
you indicated that it should be off your
records entirely; is that correct?
    A       Right, right.  This is a verbal
that I don't want -- I cannot do that
stuff there, so --
    Q       What do you mean?
    A       -- eventually, it was eliminated
from any future notes.
    Q       What do you mean by you "cannot
do that stuff there"?
    A       I couldn't prescribe anything
```

there, basically, whether supplies or
ointments, even if the patient, you know,
asked for it, I could not prescribe
anything.

So at some point in time, the
note is to be adjusted where it's not even
there so I wouldn't have to remove the
blank or cross them out.

Q      Why weren't you allowed to do
that?

A      I just didn't want to be
involved with that, basically, the
physical therapist.

Q      The physical therapist didn't
want you to do that?

A      Right.   That was, like, a verbal
agreement.

Q      Was that Singh?

A      Right, mm-hmm.

So that's why the notes don't
have those two areas.

```
        THE WITNESS:  No, no, no.

        ATTORNEY BRADY:  She testified

    that Singh told her to stop putting --

    to prescribing those.  That's the

    testimony.  It's in the record.

        A    It was just a verbal agreement

    that, you know -- none of have stuff, you

    know, I don't want it, you know, so that's

    it.
```

171.    At the direction of Ahuja, patients who presented at the 94-13 120th Street Clinic purportedly received an initial evaluation at Trinity Medical, which made the unlawful referrals to Singh PLLC to allow them to bill Liberty Mutual for unnecessary physical therapy treatment and testing.

172.    All of the Defendants are under the control of Ahuja.

173.    Collectively, Ahuja furthered the objectives of the scheme by (a) seizing control over Trinity Medical despite not being authorized to provide, or manage, treatment and tests, (b) exerting control over the operation and management of Trinity Medical, (c) demanding the unlawful and unnecessary referrals to Singh PLLC for protocol physical therapy treatments (many of which were never rendered), (d) devising and implementing a routine protocol of medically unnecessary and excessive treatment and tests, (e) submitting, or causing the submission, of No-Fault benefit claims to Liberty Mutual that contained false information about Trinity Medical's eligibility to seek and collect No-Fault benefit payments, (f) causing the Provider Defendants to collect payments that they were not lawfully entitled to collect, (g) unlawfully channeling the

professional fees and profits of Trinity Medical for his own personal benefit using other companies under his control, (h) facilitating unneeded patient referrals from Trinity Medical to Singh PLLC, (i) demanding and collecting payment for these unnecessary healthcare treatments and tests, and (j) entering into unlawful referral arrangements with Brown and Trinity Medical.

174.    By virtue of his nominal ownership of Trinty Medical, Ahuja was able to engage in the following misconduct as a means to propel this scheme:

- Billing Liberty Mutual for medically unnecessary treatment and tests that were not rendered as billed;

- Siphoning revenue from Trinity Medical—revenue that was generated from the provision of healthcare services to Liberty Mutual Claimants;

- Devising unlawful referral arrangements with Trinity Medical, which allowed Singh PLLC to bill for unnecessary physical therapy services; and

- Disguising kickback payments from Brown and Trinity Medical as "rent" payments for access to the Singh PLLC patient base.

175.    Brown furthered the objectives of this scheme by (a) allowing Ahuja to illegally own, operate, and control Trinity Medical to illegally siphon its profits; (b) making unlawful referrals to Singh PLLC for unnecessary treatments; (c) billing for tests, treatment, and services not provided; (d) billing for unnecessary tests, treatment, and services; and (e) billing for excessive fees for tests, treatment, and services.

176.    Such conduct is not only prohibited under New York law, but was also dangerous to the patients who were subjected to these clinically unwarranted and unneeded treatment, tests, and referrals.

177.    Throughout the entirety of this scheme, the Defendants caused Trinity Medical to be operated in violation of New York law, and, as such, Trinity Medical's claims for No-Fault reimbursement were never lawfully compensable under New York law.

### B.    UNLAWFUL REFERRALS

178.    NY Public Health Law § 238-a prohibits certain health care service providers from referring the performance of services such as medical testing and other services to those with whom they have a financial relationship. *See* N.Y. Pub. Health L. § 238-a(1)(a).

179.    Broadly speaking, such financial relationships are thought ***to taint the health care process, with referrals being driven more by profit than by patient care***. In the event that Section 238-a is violated, neither the referring provider nor the provider of the service are entitled to payment from a third-party insurer such as Liberty Mutual. N.Y. Pub. Health L. § 238-a(1)(b). *See Cambridge Med., P.C. v. Allstate Ins. Co.*, C.A. 2:11-cv-04044 (E.D.N.Y.).

180.    In the event that Section 238-a is violated, ***neither*** the referring provider nor the provider of the service are entitled to payment from a third-party insurer, such as Liberty Mutual. *See* N.Y. Pub. Health L. § 238-a(1)(b).

181.    Section 238-d(2) requires that the disclosure "provide notice of any such financial relationship and shall also inform the patient of his or her right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available."

182.    If a referral is subject to section 238-d and the disclosure requirement is not met, then the provider has failed to comply with applicable licensing requirements and is therefore ineligible to collect No-Fault payments.

183.    The Defendants all share a financial relationship subject to the New York Public Health Law.

184.    The Defendant's involvement with the Provider Defendants at the 94-13 120th Street Clinic was both intentional and crucial to the financial success of their scheme because controlling all of these providers under the same roof allowed all providers operating from the

clinic to cultivate symbiotic relationships between and establish unlawful referral arrangements among their professional corporations.

185.    Ahuja personally rented the space at the 94-13 120th Street Clinic.

186.    True and accurate excerpts from testimony of Ahuja are contained below:

```
     Q      Do you or the P.C. own or lease
a space at 94-13 120th Street in Queens?
     A      Say again.
     Q      Do you or Singh P.T., P.L.L.C.
own the space at 94-13 120th Street?
     A      Yes, I rent those floors.
     Q      You rent those floors?
     A      Yes.
     Q      Is it you personally or Singh
P.T., P.L.L.C. renting that space?
     A      Personally.
     Q      Personally.
            So you, personally, lease the
space at that location for those two
floors?
     A      Yes.
```

187.    As part of this scheme, Brown (through Trinity Medical) was required by Ahuja to make referrals to Singh PLLC.

188.    Brown refers patients to Singh PLLC.

189.    True and accurate excerpts from testimony of Ahuja are contained below:

Q        Does she ever refer patients to you?

A        Can you elaborate, please?

Q        Has she ever referred patients to your clinic?

A        What do you mean "referred patients" to my clinic?

Q        Are you required under New York law or in order to be compensated to have a referral from a medical doctor in order to conduct physical therapy after the first visit for any patient?

A        Yeah, physical therapy referral is required.

Q        So I'll repeat my question.

         Has Dr. Brown ever referred patients for physical therapy to Singh P.T., P.L.L.C.?

A        Whatever patients required for physical therapy referral or evaluation by Dr. Paula Brown, they been referred.

Q        So that's a yes?

A        Yes.

190.    Although Singh PLLC does not do re-evaluations on motor vehicle accident claimants, Ahuja requires Brown to perform re-evaluations to obtain the necessary physical therapy referrals.

191.    True and accurate excerpts from testimony of Ahuja are contained below:

> Q      So during the course of a
> conservative physical therapy, you
> wouldn't be required or obligated to

> conduct a reevaluation of the patient
> within, say, 30 or 60 days?
>     A      It's not obligated or
> requirement.  Yes, reevaluation is
> required, but I'm not able to do it.
>     Q      Why is that?
>     A      Because in motor vehicle
> accidents, the patient's symptoms remain
> almost the same on a daily basis, so
> reevaluation didn't get much results.

> Q      Okay.
>            Do patients ever get reevaluated

```
by Dr. Brown when they're in the course of
care with you?
     A      Yes, every four weeks.
     Q      Why is that?
     A      Because Dr. Brown is the M.D.
     Q      If the M.D. did not evaluate the
patient every four weeks, would you be
able to continue administering physical
therapy?
     A      No.
```

192.    Indeed, Singh PLLC receives 75-80% of all patients through Trinity Medical referrals.

193.    True and accurate excerpts from testimony of Ahuja are contained below:

```
     Q      What percentage of your practice
```

```
would you say are referrals from Paula
Brown?
     A      Seventy-five to eighty percent.
```

194.    Brown and Trinity Medical did not provide the required informed consent disclosure when referring Liberty Mutual Claimants to Ahuja and Singh PLLC in violation of N.Y. Pub. Health L. § 238-a and 238-d.

195.    True and accurate excerpts from testimony of Ahuja are contained below:

> Q      So you don't have any
> disclosures about any financial
> arrangement you have with Dr. Brown
> because your testimony is you don't have a
> financial relationship with Dr. Brown; is
> that right?
>      A      Yes.

> Q      Do you -- in the same vein, do
> you have any forms that you give to
> patients that mention anything about your
> lease with Paula Brown?
>      A      No.

196.    A true and accurate excerpt from testimony of Brown is contained below:

```
              Do you have any other
disclosures to the patients regarding any
other issues about medicine?
     A    No.
     Q    Do you have any other
disclosures about your business that are
either posted in the facilities or -- that
are posted in the facilities for any other
reason?
     A    No.
     Q    Do you have any other
disclosures handed to patients regarding
any referrals you might issue?
     A    No.
```

197.    Ahuja co-opted Brown to enter into a sublease agreement at the 94-13 120th Street

Clinic.

198.    True and accurate excerpts from testimony of Ahuja are contained below:

```
     Q    I'm asking if you know Dr. Brown
and who Dr. Brown is.
     A    Dr. Brown, a medical doctor in
my office who leases space from me.
```

```
    Q    Do you have a written contract
with her?
    A    Yes, I do.
    Q    A lease?
    A    Yes.
    Q    How much does she pay you per
month for that space?
    A    $5,000 a month.
    Q    How much space does that
include?
    A    We'll provide a copy of the
lease to my counsel later.
```

199.    Although Ahuja leases the clinic space at the 94-13 120th Street Clinic, Singh PLLC entered into a sublease with Trinity Medical.

200.    True and accurate representations of the relevant lease terms are contained below:

## COMMERCIAL LEASE AGREEMENT

**THIS AGREEMENT** is hereby entered into on 14TH day of July Two Thousand and Twenty

### BETWEEN

**1. Singh Physical Therapy, PLLC**, a corporation located at 94-13 120th Street, Queens, NY, 11419, hereinafter referred to as the ("Landlord",)

### AND

**2. Trinity Medical Healthcare Services**, having its principal place of business at 1345 6th. Avenue, 2nd. Floor, NY, NY, 10105, hereinafter referred to as the ("Tenant".)

5.1 The Tenant shall pay a monthly rent of $5,000.00 (the "Base Rent") for the Premises.

TENANT

NAME:

_P. Brown MD_

SIGNATURE:

DATE:

7/14/2020

201.    Brown testified to the lease provisions with Singh PLLC.

202.    True and accurate excerpts from testimony of Brown are contained below:

```
    Q      How about at 94-13 120th Street,
South Richmond Hill, Queens, do you have a
lease there?
    A      $5,000.  I'm the lessor, yes.
    Q      So you pay $5,000 per month for
that space?
    A      Yeah.  It's a lease.  Coney
Island is a sublease.
```

```
    Q      So who do you lease the Queens
location from for Trinity?
    A      Singh Physical Therapy.
```

203.    Notably, the lease agreement was more than three times the cost of similar leases as the other clinics.

204.    A true and accurate excerpt from testimony of Brown is contained below:

```
    Q      So I'm sorry, did you say that
at Coney Island Avenue, you pay $1,500 a
month on a sublease to --
    A      T-A-T-A-Y.
    Q      T-A-T-A-Y.
           And that's a sublease?
    A      Yes.
    Q      And then you have a lease from
Singh P.T. for $5,000 a month in Queens?
    A      Right, mm-hmm.
```

205.    Trinity Medical only leases approximately 500 square feet of the clinic for three days per week.

206.    A true and accurate excerpt from testimony of Ahuja is contained below:

```
    Q      Now, based on your knowledge of
the space, having been there since 2020,
about how big is it?
    A      It's 2,200 square feet.
    Q      For your office space; is that
right?
    A      Yes.  Both floors.
    Q      And you leased part of that to
Paula Brown; is that correct?
    A      She only lease three times a
week.
    Q      Three times a week.
           But part of that space is for
Paula Brown, or does she have access to
all 2,200 square feet?
    A      No, 500.  Second floor.
    Q      Does she have access to the
whole second floor?
    A      Two rooms on the second floor.
```

207.    Although Trinity Medical pays Singh PLLC $5,000.00 per month for limited use (500 square feet for 3 days a week), Ahuja leased the entire clinic space (2,200 square feet) for less money ($4,400.00).

208.    A true and accurate excerpt from testimony of Ahuja is contained below:

```
Q      What is the current rent that
you pay to Mr. Islam for the space?
     A      $2,200 per floor each month.
     Q      So $4,400 total?
     A      Yes, a month.
```

209.    The sublease is void *ab initio* whereas Singh PLLC did not have the power to lease premises that it did not rightfully possess.

210.    Singh PLLC subleases space to Brown and Trinity Medical at this location, which has a staff already in place.

211.    Although seemingly all separate, distinct, and legal entities, the Provider Defendants shared office space, staff, and expenses.

212.    Trinity Medical has no signage at the clinic location.

213.    A true and accurate image of the exterior of the 94-13 120th Street Clinic is contained below:



214.    Singh PLLC paid for transportation costs of its patients without seeking reimbursement for the patients or the responsible insurer.

215.    True and accurate excerpts from testimony of Ahuja are contained below:

> Q      Do you pay for any transportation services?
> A      No.  I use Uber or Lyft app to provide transportation to the patients.

> Q      Do you charge them for this?
> A      No.

216.    Ahuja also claims that Uber and Lyft costs are included in the rent payments of

Trinity Medical to Singh PLLC.

217.    A true and accurate excerpt from testimony of Ahuja is contained below:

> Q    Does Paula Brown ever pay you for transportation for Uber and Lyft?
>
> A    As part of the lease agreement that we have, she pitch in the $5,000 rent, so it's part of Uber and Lyft.
>
> Q    So it's part of her rent that's incorporated?
>
> A    Yes.
>
> Q    So she doesn't reimburse you for that expense?
>
> A    No.

218.    This is contrary to the actual lease documents and Brown's testimony.

219.    A true and accurate representation of the relevant lease term is contained below:

> 5.2 In addition to the Base Rent, the Tenant agrees to pay a transportation cost supplement. The transportation cost supplement shall be calculated on a monthly basis and shall be equal to 50% of the actual transportation costs incurred by the Landlord in providing transportation services to patients of the medical practice during the preceding month. The transportation cost supplement shall be added to the Base Rent each month.

220.    A true and accurate excerpt from testimony of Brown is contained below:

> Do you provide any transportation to your patients?
>
> A    There's only one site, Singh, that has Uber and Lyft, and the patient can utilize it if they need to.
>
> Q    So do you pay for the Uber and Lyft or does Singh?
>
> A    Yes, so then it's paid back to him.
>
> Q    So you pay for it, and then you pay Singh back?
>
> A    No, Singh pays for it, and then it's paid back to him.
>
> Q    Oh, okay. By you or by the insurance company?
>
> A    By the company, my company.

221.    Ahuja lied during his Examination Under Oath about the payments that Trinity Medical and Brown paid in connection with the Uber and Lyft patients.

222.    Trinity Medical does not advertise or market their services because they operate from a clinic with an existing client base.

223.    True and accurate excerpts from testimony of Brown are contained below:

> Q     Do you have any marketing
> companies that you work with for Trinity
> or WeCare?
>     A     No.  Not now, no.

> Q     Do you do any marketing on your
> own to patients?
>     A     No, not really.  Don't really
> have to.

224.    Brown admitted that the patients were already at the clinic location.

225.    A true and accurate excerpt from testimony of Brown is contained below:

> Q     How does Trinity and how does
> WeCare obtain patients?  If it's the same,
> that's fine.  If it's different, let me
> know.
>     A     Basically, overall, the patients
> are already there.  They're, like, in

226.    Ahuja is not paid through Singh PLLC.

227.    Ahuja disregarded Singh PLLC corporate form by paying **_all_** of his personal expenses through Singh PLLC.

228.    True and accurate excerpts from testimony of Ahuja are contained below:

Q    Now, you mentioned before that you don't actually get compensated by

Singh P.T., P.L.L.C.; is that correct?

A    Yes.

Q    What did you mean by that?

A    I don't get paid from Singh P.T., P.L.L.C.

Q    But the business would pay your expenses; is that correct?

A    Yes.

Q    What do these include?

A    My rent, my car insurance, and my meals and my phone bills.  That's it.

Q    You mean the rent at 94-13 120th Street or your personal address?

A    94-15 120th Street.

Q    94-15 120th Street is your personal address; correct?

A    Yes.

```
     Q      So what would you describe as
the business's current expenses?
     A      Utility bills, electric, gas,
phone bill, car insurances, any office
supplies, any gas for the car company --
for my cars, meals.
     Q      Rent?
     A      Yes.
```

229.    The unlawful referrals from Trinity Medical are dictated by Ahuja.

230.    At the direction of Ahuja, Brown and Trinity Medical referred to Singh PLLC to allow it to fraudulently bill Liberty Mutual.

231.    Brown and Trinity Medical did not provide the required disclosure for Brown and Trinity Medical to bill Liberty Mutual.

232.    These referrals resulted in additional treatment, which, in turn, caused unlawful bills to be created and then submitted to Liberty Mutual seeking No-Fault reimbursement.

233.    All of these claims and bills were furnished pursuant to an illegal arrangement carried out through lease and licensing agreements through which Trinity Medical referred patients to Singh PLLC with which the Defendants had a financial relationship, thus rendering these claims and bills ineffective.

234.    The failure to disclose the Defendants financial interests in the referrals was intentional.

235.    Indeed, any such disclosure would have revealed the Defendants' carefully concealed fraudulent scheme, and may have drawn questions from patients and insurers about the

legitimacy of the referrals and the resulting treatment.

236.    Under New York law, Liberty Mutual has no obligation to pay any claims that arise from unlawful referral arrangements.

237.    Accordingly, to the extent that Liberty Mutual paid the Defendants in reliance on documents created and submitted to Liberty Mutual in connection with these unlawful referrals, including, but not limited to, those payments listed in Exhibits 1-2, Liberty Mutual is entitled to recover all payments made in connection with any such service.

238.    In connection with the claims submitted to Liberty Mutual, the Defendants failed to disclose the financial and/or familial relationships thus rendering all treatment by the Provider Defendants unlawful.

239.    To the extent that any of the Provider Defendants' charges submitted in connection with unlawful referrals remain unpaid, Liberty Mutual is under no obligation to make any payments in connection with those transactions.

### C.    BILLING FOR SERVICES NOT RENDERED

240.    The Defendants' scheme involved billing for services not actually rendered to Liberty Mutual Claimants.

241.    The Defendants used Singh PLLC to bill Liberty Mutual for physical therapy treatment that was never rendered to Liberty Mutual Claimants.

242.    Specifically, Singh PLLC billed Liberty Mutual on average $35.72 pursuant to CPT Code 97110 (therapeutic exercise), $31.37 pursuant to CPT Code 97112 (neuromuscular reeducation), and $31.82 pursuant to CPT Code 97140 (manual therapy and/or myofascial release) that are classified by the American Medical Association's Current Procedural Terminology ("CPT") Coding Manual as procedures mandating a "physician or therapist required to have direct

(one-on-one) patient contact."

243.    These physical therapy treatments billed by Singh PLLC expressly require (1) direct, one-on-one patient contact, and (2) constant attendance from a single provider exclusively monitoring a single patient.

244.    A physical therapist cannot bill for these specific CPT codes while treating multiple patients.

245.    Singh PLLC routinely billed Liberty Mutual for procedures requiring direct, one-on-one supervision and constant attendance when Liberty Mutual Claimants engaged in group exercises.

246.    Singh PLLC cannot bill for treatment modalities that require direct, one-on-one supervision, including all therapeutic exercises, neuromuscular reeducation, and therapeutic activities, if Liberty Mutual Claimants can perform the procedure independently without skilled intervention.

247.    The therapeutic exercises most commonly billed by Singh PLLC, such as "stretching," "treadmill," and "exercise bike" are not the type that require one-on-one direct contact with a licensed physical therapist.

248.    True and accurate excerpts from testimony of Ahuja are contained below:

```
    Q       When you say "two fitness
equipment," what do you mean by that?
    A       One elliptical, one treadmill.
    Q       Is that used for physical
therapy?
    A       Yes, sir.
```

```
    Q      And how often would the
elliptical and treadmill be incorporated
into patient care?
    A      Every day.
    Q      For what purpose?
    A      For therapeutic exercise.
```

```
    Q      So would you say, based on this
therapeutic exercise bill right here
(indicating), that this person did the
treadmill for their exercises on the
```

```
right?
    A      Yes.
```

249.    To properly bill for alleged one-on-one therapeutic exercises, Singh PLLC must document: (1) the need for the treatment performed; (2) the time spent in performing the procedure; (3) the equipment necessary to provide the treatment; and (4) evidence of direct one-on-one treatment.

250.    Patients at issue herein reported to Liberty Mutual that treatments billed by Singh PLLC were not actually supervised.

251.    For example, claimant K.N. (claim number 056600893) was solicited by Singh PLLC following a motor vehicle accident on April 15, 2024.

252.    On or around April 17-18, 2024, K.N. appeared at Singh PLLC to complete paperwork.

253.    K.N. denied receiving an examination or treatment that day.

254.    True and accurate excerpts from testimony of K.N. are contained below:

```
    Q       When did you first go to that therapy
office?

    A       After the accident, probably on the
17th or 18th, probably.
```

```
    Q       When you first went to that therapy
office, did you complete paperwork?

    A       Yes, sir.  I signed a couple of
papers.
```

```
    Q       Were you examined by anyone during
your first visit there?

    A       Not at the first visit.

    Q       Other than completing paperwork that
first day, did you do anything else at that
therapy office?

    A       No.
```

255.    However, Singh PLLC billed a total of $217.92 pursuant to CPT Codes 97140, 97010, 97014, and 97110 for dates of service April 17-18, 2024.

256.    True and accurate examples of billing by Singh PLLC are contained below:

**PROVIDER'S NAME AND ADDRESS:**
SINGH PT PLLC
9413 120 STREET SUITE 1
QUEENS, NY 11419          Tel: 718-530-8881

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | FEE SCHEDULE TREATMENT CODES | CHARGE FOR EACH PROCEDURE | TOTAL CHARGE PER DAY |
|---|---|---|---|---|---|
| 04/16/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | PT Evaluation | 97161 | $90.44 | $90.44 |
| 04/16/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Myofcial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | $71.05 |
| 04/17/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Myofcial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 04/18/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Myofcial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | $108.96 |
| 04/19/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Myofcial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 04/22/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Myofcial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |

257.    Trinity Medical billed $625.82 pursuant to CPT Codes 99203, 20553, 20610, and 76942 for the date of service April 16, 2024.

258.    True and accurate examples of billing by Trinity Medical are contained below:

PROVIDER'S NAME AND ADDRESS:
**TRINITY MEDICAL HEALTHCARE SERVICES PC**
PO BOX 13-1709
STATEN ISLAND, NY 10313        Tel:

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | | FEE SCHEDULE TREATMENT CODES | | TOTAL CHARGE |
|---|---|---|---|---|---|---|
| 4/16/24 | 9413 120 STREET SUITE 1 QUEENS, NY | Office Visit Lev 4 | x 1 | 99203 | 25 | $142.62 |
| 4/16/24 | 9413 120 STREET SUITE 1 QUEENS, NY | 3 or more muscular Trigger Point | x 1 | 20553 | 59 | $131.01 |
| 4/16/24 | 9413 120 STREET SUITE 1 QUEENS, NY | Injection;major joint bursa | x 1 | 20610 | LT | $62.99 |
| 4/16/24 | 9413 120 STREET SUITE 1 QUEENS, NY | Ultrasonic guidance for needle placement | x 1 | 76942 | | $289.20 |
| | | | | TOTAL CHARGES TO DATE : | | $625.82 |

259.    Thereafter, K.N. returned to Singh PLLC for one visit where he was examined by a female doctor for 20 minutes. Subsequently, he was examined by a male doctor for 10 minutes.

260.    True and accurate excerpts from testimony of K.N. are contained below:

Q       When did you go back to the therapy office?

A       After a couple days.  I don't remember the correct date, but ...

Q       During that second visit, were you examined by someone?

A       Yes, sir.

Q       Who were you examined by?

A       So, it was a lady first.  She checked the pain, like she asked me questions 1 to 10 how bad the pain is, and then, the doctor in the next room, and that's all.

Q       And how long did you meet with that first lady?

A       I was with her for like 15, 20 minutes.

Q       And how long were you with the doctor?

A       Like 10, 10 minutes, probably.

> Q    Other than meeting with that lady and meeting with that doctor, did you receive any treatment or any other examinations during

> that second visit?
> A    No.

261.    K.N. never returned to Singh PLLC.

262.    A true and accurate excerpt from testimony of K.N. is contained below:

> Q    Did you ever return to the therapy office after that?
> A    No.

263.    Singh PLLC submitted subsequent billing for services not rendered to K.N. between April 23, 2024 and April 26, 2024.

264.    True and accurate examples of billing by Singh PLLC are contained below:

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | FEE SCHEDULE TREATMENT CODES | CHARGE FOR EACH PROCEDURE | TOTAL CHARGE PER DAY |
|---|---|---|---|---|---|
| 04/23/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myofacial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | $108.20 |
| 04/25/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myofacial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | $108.20 |
| 04/26/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Myofacial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| | | | | TOTAL CHARGES TO DATE : | $922.69 |

265.    Singh PLLC submitted subsequent billing for services not rendered to K.N. between April 30, 2024 and May 6, 2024.

266.    True and accurate examples of billing by Singh PLLC are contained below:

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | FEE SCHEDULE TREATMENT CODES | CHARGE FOR EACH PROCEDURE | TOTAL CHARGE PER DAY |
|---|---|---|---|---|---|
| 04/30/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Myofacial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/01/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Myofacial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/02/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Myofacial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | $108.20 |
| 05/03/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Myofacial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/06/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Myofacial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | $108.20 |

267.    Singh PLLC submitted subsequent billing for services not rendered to K.N. between May 7, 2024 and May 14, 2024.

60

268.    True and accurate examples of billing by Singh PLLC are contained below:

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | FEE SCHEDULE TREATMENT CODES | CHARGE FOR EACH PROCEDURE | TOTAL CHARGE PER DAY |
|---|---|---|---|---|---|
| 05/07/2024 | 9413 130 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/08/2024 | 9413 130 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/09/2024 | 9413 130 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/13/2024 | 9413 130 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | $108.20 |
| 05/14/2024 | 9413 130 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| | | | | TOTAL CHARGES TO DATE : | $1,087.32 |

269.    Singh PLLC submitted subsequent billing for services not rendered to K.N. between May 15, 2024 and May 22, 2024.

270.    True and accurate examples of billing by Singh PLLC are contained below:

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | FEE SCHEDULE TREATMENT CODES | CHARGE FOR EACH PROCEDURE | TOTAL CHARGE PER DAY |
|---|---|---|---|---|---|
| 05/15/2024 | 9413 130 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Myofacial Release | 97140 | $40.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/17/2024 | 9413 130 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Myofacial Release | 97140 | $40.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | $108.20 |
| 05/20/2024 | 9413 130 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Myofacial Release | 97140 | $40.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/21/2024 | 9413 130 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Myofacial Release | 97140 | $40.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/22/2024 | 9413 130 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Myofacial Release | 97140 | $40.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | $108.20 |

271.    Singh PLLC submitted subsequent billing for services not rendered to K.N. between May 24, 2024 and May 31, 2024.

272.    True and accurate examples of billing by Singh PLLC are contained below:

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | FEE SCHEDULE TREATMENT CODES | CHARGE FOR EACH PROCEDURE | TOTAL CHARGE PER DAY |
|---|---|---|---|---|---|
| 05/24/2024 | 9413 130 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Myofacial Release | 97140 | $40.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/28/2024 | 9413 130 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Myofacial Release | 97140 | $40.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/29/2024 | 9413 130 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Myofacial Release | 97140 | $40.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | $108.20 |
| 05/30/2024 | 9413 130 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Myofacial Release | 97140 | $40.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/31/2024 | 9413 130 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Myofacial Release | 97140 | $40.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |

273.    Singh PLLC submitted subsequent billing for services not rendered to K.N. between June 3, 2024 and June 4, 2024.

274.    True and accurate examples of billing by Singh PLLC are contained below:

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | FEE SCHEDULE TREATMENT CODES | CHARGE FOR EACH PROCEDURE | TOTAL CHARGE PER DAY |
|---|---|---|---|---|---|
| 06/03/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | $108.20 |
| 06/04/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| | | | | TOTAL CHARGES TO DATE : | $1,304.48 |

275.    Ahuja, or someone acting on his behalf, instructed K.N. to not speak with Liberty Mutual regarding their treatment at Singh PLLC and/or Trinity Medical.

276.    In addition, claimant J.S. (claim number 056176217) was solicited by Singh PLLC following a motor vehicle accident on April 25, 2024.

277.    Specifically, J.S. was approached by B.W. who also referred J.S. to Singh PLLC and/or Trinity Medical.

278.    J.S. denied receiving any re-evaluations while treating at the 94-13 120th Street Clinic.

279.    J.S. denied receiving any injections from Trinity Medical or Brown.

280.    Trinity Medical billed for trigger point injections in connection with J.S.

281.    True and accurate examples of billing by Trinity Medical are contained below:

PROVIDER'S NAME AND ADDRESS:
**TRINITY MEDICAL HEALTHCARE SERVICES PC**
PO BOX 13-1709
STATEN ISLAND, NY 10313    Tel:

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | | FEE SCHEDULE TREATMENT CODES | | TOTAL CHARGE |
|---|---|---|---|---|---|---|
| 4/26/24 | 9413 120 STREET SUITE 1 QUEENS, NY | - Office Visit Lev 4 | x 1 | 99203 | 25 | **$142.62** |
| 4/26/24 | 9413 120 STREET SUITE 1 QUEENS, NY | - 59  3 or more muscular Trigger Point | x 1 | 20553 | 59 | **$131.01** |
| | | | | TOTAL CHARGES TO DATE : | | **$273.63** |

282.    J.S. denied receiving any hot pack therapy while treating at Singh PLLC.

283.    Singh PLLC billed for 36 separate hot pack therapy treatments in connection with J.S.

284.    True and accurate examples of billing by Singh PLLC are contained below:

PROVIDER'S NAME AND ADDRESS:
**SINGH PT PLLC**
9413 120 STREET SUITE 1
QUEENS, NY 11419    Tel: 718-530-8881

15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | FEE SCHEDULE TREATMENT CODES | CHARGE FOR EACH PROCEDURE | TOTAL CHARGE PER DAY |
|---|---|---|---|---|---|
| 04/30/2024 | 9413 130 STREET SUITE 1 QUEENS, NY | PT Evaluation | 97161 | $90.44 | $90.44 |
| 04/30/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | $71.05 |
| 05/01/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/02/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 150 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/03/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/06/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | $108.20 |

15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | FEE SCHEDULE TREATMENT CODES | CHARGE FOR EACH PROCEDURE | TOTAL CHARGE PER DAY |
|---|---|---|---|---|---|
| 05/07/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/08/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/09/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/13/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/14/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |

15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | FEE SCHEDULE TREATMENT CODES | CHARGE FOR EACH PROCEDURE | TOTAL CHARGE PER DAY |
|---|---|---|---|---|---|
| 05/15/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myofical Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/17/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myofical Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | $108.20 |
| 05/20/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myofical Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | $108.20 |
| 05/21/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myofical Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| | | | | TOTAL CHARGES TO DATE : | $1,575.69 |

15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | FEE SCHEDULE TREATMENT CODES | CHARGE FOR EACH PROCEDURE | TOTAL CHARGE PER DAY |
|---|---|---|---|---|---|
| 05/22/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myofical Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | $108.20 |
| 05/23/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myofical Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/28/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myofical Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 05/29/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myofical Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | $108.20 |
| 05/30/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myofical Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |

15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | FEE SCHEDULE TREATMENT CODES | CHARGE FOR EACH PROCEDURE | TOTAL CHARGE PER DAY |
|---|---|---|---|---|---|
| 05/31/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 06/03/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 06/04/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 06/05/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 06/06/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | $108.20 |

15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | FEE SCHEDULE TREATMENT CODES | CHARGE FOR EACH PROCEDURE | TOTAL CHARGE PER DAY |
|---|---|---|---|---|---|
| 06/10/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | $108.96 |
| 06/11/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| | | | | TOTAL CHARGES TO DATE : | $1,305.24 |

15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | FEE SCHEDULE TREATMENT CODES | CHARGE FOR EACH PROCEDURE | TOTAL CHARGE PER DAY |
|---|---|---|---|---|---|
| 06/12/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 06/14/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | $108.20 |
| 06/17/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $105.71 |
| 06/18/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 06/19/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | $108.20 |

15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | FEE SCHEDULE TREATMENT CODES | CHARGE FOR EACH PROCEDURE | TOTAL CHARGE PER DAY |
|---|---|---|---|---|---|
| 06/21/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 06/24/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| 06/25/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | $108.20 |
| 06/26/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | $108.20 |
| 06/27/2024 | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | $108.96 |
| | | | | TOTAL CHARGES TO DATE : | $1,083.31 |

285.    Ahuja admitted that Singh PLLC saw 60-70 patients per day.

286.    A true and accurate excerpt from testimony of Ahuja is contained below:

```
    Q      Do you know how many patients
you see on an average day at your
business?
    A      Sixty to seventy.
    Q      Sixty to seventy patients per
day?
    A      Yes.
    Q      And you are the one who
administers the treatment, therapeutic
exercise, electrical stimulation, anything
to them?
    A      Yes.
    Q      Did any of your employees do
anything with the patients?
    A      No.
```

287.    Singh PLLC never billed Liberty Mutual for a single unit of group physical therapy and instead only billed for alleged "one-on-one" exercises, which can be billed at a higher rate. *See* Exhibit 3.

288.    Singh PLLC billed Liberty Mutual for purported therapeutic exercises pursuant to CPT Code 97110, which cannot be billed relative to previously taught exercises, patients performing exercises independently, or the use of exercise equipment without the direct, one-on-one intervention or skills of the therapist.

289.    Singh lied during his testimony by claiming that therapeutic exercises billed

pursuant to CPT code 97110 do not require one-on-one intervention.

290.    A true and accurate excerpt from testimony of Ahuja is contained below:

> And does 97110 require one-on-one supervised exercise?
>
> A    It requires supervision of the physical therapist, not one-on-one.

291.    The therapeutic exercises billed by Singh PLLC were not actually performed in connection with the Liberty Mutual Claimants identified in Exhibit 3 and constitute fraudulent billing.

292.    Singh PLLC billed Liberty Mutual for neuromuscular reeducation pursuant to CPT Code 97112, which requires direct, one-on-one intervention, as the therapist is required to provide specific instructions to the patient as to each technique, as well as specific feedback about the quality or specify of a particular movement.

293.    The neuromuscular reeducation billed by Singh PLLC was not actually performed in connection with the Liberty Mutual Claimants identified in Exhibit 4 and constitutes fraudulent billing.

294.    Singh PLLC billed Liberty Mutual for manual therapy pursuant to CPT Code 97140.

295.    The manual therapy billed by Singh PLLC was not actually performed in connection with the Liberty Mutual Claimants identified in Exhibit 5 and constitutes fraudulent billing.

296.    Singh PLLC submitted fraudulent claims to Liberty Mutual relative to each

physical therapy treatment modality that were not actually provided and Liberty Mutual relied on such submissions in adjusting the claims.

297.    Ahuja admitted that he administered skilled physical therapy at separate and distinct times.

298.    A true and accurate excerpt from testimony of Ahuja is contained below:

```
    Q      Where is neuromuscular
reeducation?
    A      Sometimes in the back, sometimes
in the front.
    Q      Is that ever done in an exam
room?
    A      Sometimes.
    Q      And then that is a separate and
distinct 15 minutes from the therapy?
    A      Yes.
    Q      And then manual therapy would be
a separate and distinct 15 minutes from
the --
    A      Yes.
```

299.    It is impossible to treat 60-70 patients per day, each requiring a minimum of 45 minutes of physical therapy.

300.    Billing Liberty Mutual for physical therapy treatment modalities that were not actually provided constitutes billing for services not rendered.

301.    Liberty Mutual is not required to pay Singh PLLC for physical therapy treatment

that was not actually rendered and they are entitled to reimbursement for payments they were induced to make by Singh PLLC's fraudulent submissions.

302. All of the bills submitted by Singh PLLC that were submitted by the Defendants through the U.S. Mail seeking payment from Liberty Mutual for treatment that never occurred are fraudulent.

**D.    FORGED OR ALTERED SIGNATURES**

303. The Defendants forged and altered signatures to justify the healthcare being dispensed to Liberty Mutual Claimants.

304. Brown admitted that her signature was forged or that her prescriptions were altered to include additional healthcare services that was not prescribed by the physician.

305. Brown admitted to Liberty Mutual that durable medical equipment ("DME") order forms submitted by Junato Inc, a DME provider, are fraudulent.

306. A true and accurate copy of the forged DME order form is depicted below:



307.    Brown admitted to Liberty Mutual that DME order forms submitted by Nayuvito Inc., another DME provider, are fraudulent.

308.    True and accurate copies of the forged DME order form are depicted below:





309.    Brown admitted to Liberty Mutual that DME order forms submitted by Tiarillie Inc., another DME provider, are fraudulent.

310.    A true and accurate copy of the forged DME order form is depicted below:



311.    Brown admitted to Liberty Mutual that DME order forms submitted by Vigull Inc., another DME provider, are fraudulent.

312.    A true and accurate copy of the forged DME order form is depicted below:



313.    Brown has admitted to using at least 4 separate signatures when signing No-Fault medical documentation that was submitted to Liberty Mutual.

314.    True and accurate examples of Brown's signature are depicted below:



315.    Specifically, Brown testified that she was testing various signatures.

316.    True and accurate excerpts from testimony of Brown are contained below:

```
    Q      Do you have a signature stamp
that you use at your business?
    A      No, no.  It's not safe, so I
don't bring that around.
```

```
    Q      What does your signature stamp
look like?
    A      I guess it's black-and-white.
    Q      Sure.
           Is it, like, a thicker looking
signature as opposed to, like, a pen
signature?
    A      Oh, I tried to change my
handwriting.  I used to write out my whole
name, and I was advised that's not good,
```

```
you need to do something with your writing
because anybody can copy or change it.
It's just annoying.
           So I'm trying to have a distinct
signature -- not a distinct signature, but
a signature that no one can copy.
```

Let me just share this with you.

This is your I.D. that you presented to the court reporter?

A      Mm-hmm.

Q      Is this -- what I'm highlighting here in the blue, can you see that?

A      Yes, that's one of my

---

signatures, mm-hmm, in the past.

Q      In the past.

Do you still use that signature?

A      No.

---

Q      Let's go here.  I'll share again.  Let me try to find one of your signatures here.

Does this look like your signature?

A      Yeah, and it's -- that's one of the newer version, yes.

Q    I'm not -- I'm just saying, you said you don't use this signature anymore, it's markedly different than the other signatures used on this record, dated the same day, with you actually writing the date in instead of it being typed.

A    I'm not aware of that.

Q    Okay.

Here's another record.  This is a prescription pad by Highline Radiology; do you work with them?

A    I don't recall.

Q    It's dated for 12/1, and here's a third signature from 12/1, which looks like it's auto-generated.

A    Exactly, yes.

Q    Where do you keep the Highline Radiology prescription pad?

A    I'm not familiar with this one.

Q    Is it possible this is completely made up?

A    I can't think of this right now.

Q      It's appropriate.

       Is that your signature?  It's three different signatures for the same date.

A      I don't think that's mine.

A      It's a nice signature, but it's not my signature.

Q      And would you agree with me that on the same date of service, that there are three different signatures from you on the same -- on three different documents, an outcome assessment test, an initial evaluation, and this prescription?

       THE WITNESS:  It could have been

another day, because those formal forms are not made up the same day.

```
        This is a musculoskeletal --
it's typed, though, musculoskeletal
referral script.
    A      Mm-hmm.  And what does it say at
the bottom?
    Q      Paula Brown.
    A      I don't know anything about
this.
    Q      Is that your signature?
    A      No.
```

317.    Many of the Liberty Mutual Claimant signatures submitted by the Defendants did not match.

318.    For example, billing was submitted by the Provider Defendants regarding Claimant G.M. (claim no. 055382289).

319.    The billing contained multiple versions of G.M.'s signature, which would occasionally switch to only initials for G.M.

320.    True and accurate examples of medical records that allegedly portray G.M's signature and initials are contained below:[2]



---

[2] The provided examples of the alleged signature of G.M. have been redacted to preserve confidentiality. These images portray multiple variations of G.M.'s alleged signature and initials that differ in their use and style.






321.    Ahuja provided the following explanation for the different signatures.

322.    A true and accurate excerpt from testimony of Ahuja is contained below:

```
    Q      So his signature appears to
change around this time from this initial
to a full patient signature; do you see
that?
    A      Yes, I do.
    Q      Can you explain that?
    A      That's patient -- the way he
wants to sign, he can sign.  What can I do
with that?  It's a democracy; correct?
```

323.    All of the medical records submitted that contained forged and/or altered signatures and/or prescription forms are fraudulent.

324.    Liberty Mutual is not required to pay Singh PLLC for physical therapy treatment

that contains forged and/or altered signatures and/or prescription forms and they are entitled to reimbursement for payments they were induced to make by Singh PLLC's fraudulent submissions.

325.    All of the bills submitted by Singh PLLC that were submitted by the Defendants through the U.S. Mail seeking payment from Liberty Mutual for treatment that contained forged and/or altered signatures and/or prescription forms are fraudulent.

### E.    <u>UNLAWFUL SOLICITATION</u>

326.    The Defendants unlawfully solicited patients so they could bill Liberty Mutual for unnecessary testing, treatment, and injections.

327.    According to New York Administrative Code § 20-902, "[n]o owner of a no-fault insurance medical clinic shall use, solicit, direct, hire or employ any runner."

328.    Also, it is professional misconduct for a physician to engage in "[a]dvertising or soliciting for patronage that is not in the public interest."

329.    This includes making "offers bonuses or inducements in any form other than a discount or reduction in an established fee or price for a professional service or product." Education Law § 6530.

330.    Further, unprofessional conduct includes "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services." 8 CRR-NY § 29.1(b)(3).

331.    Ahuja unlawfully solicited motor vehicle accident victims to the Provider Defendants.

332.    Upon information and belief, Ahuja provided inducements to potential patients to get them to treat at the Provider Defendants.

333.    For example, claimant K.N. (claim number 056600893) was solicited by Singh PLLC following a motor vehicle accident on April 15, 2024.

334.    Specifically, K.N. was approached by B.W.,[3] who referred K.N. to an Attorney Singh.

335.    K.N. consulted with Attorney Singh who referred him to Singh PLLC.

336.    Attorney Singh provided K.N. with a business card for Singh PLLC.

337.    Notably, the telephone number for Singh PLLC identified on the business card was identical to the contact number for Attorney Singh.

338.    A true and accurate excerpt from testimony of K.N. is contained below:

```
    Q       Do you have any contact information
for Mr. Singh, such as, a phone number?
    A       No.  It's the number on the therapy
office card that I have it.
```

339.    In addition, Ahuja (or someone acting on his behalf) instructed K.N. to not speak with Liberty Mutual regarding his treatment at Singh PLLC and/or Trinity Medical.

340.    Claimant J.S. (claim number 056176217) was solicited by Singh PLLC following a motor vehicle accident on April 25, 2024.

341.    Specifically, J.S. was approached by B.W., who also referred J.S. to Singh PLLC and Trinity Medical.

342.    Notably, B.W. also has his own claims pending wherein he received treatment from Singh PLLC and/or Trinity Medical.

---

[3] B.W. is also known as B.S. and is sometimes referred to as B.S. in transcripts.

343.    Ahuja admitted that B.W. referred patients to Singh PLLC.

344.    True and accurate excerpts from testimony of Ahuja are contained below:



345.    Notably, Ahuja refused to allow a Liberty Mutual investigator to inspect Singh PLLC to verify pending claims pursuant to New York No-Fault laws.

346.    The Defendants engaged in unlawful solicitation of patients so they could bill Liberty Mutual for unnecessary, testing, treatment, and injections in violation of state and local licensure laws.

347.    Liberty Mutual is not required to pay Singh PLLC for physical therapy treatment that was the product of unlawful solicitation of Liberty Mutual Claimants and it is entitled to reimbursement for payments they were induced to make by Singh PLLC's fraudulent submissions.

348.    All of the bills submitted by Singh PLLC that were submitted by the Defendants through the U.S. Mail seeking payment from Liberty Mutual for treatment that was billed pursuant to unlawful solicitation of Liberty Mutual Claimants are fraudulent.

**F.    ILLEGAL FEE SPLITTING**

349.    The Defendants illegally split fees with non-healthcare providers in violation of New York law.

350.    According to New York Education Law § 6530(19), it is professional misconduct for a licensed physician to permit any person to share in the fees for professional services, other than a partner, employee, associate of a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

351.    The sharing or splitting of fees derived from the provision of professional physician services constitutes professional misconduct and subjects a physician to serious penalties, including sanctions against the offending physician's medical license.

352.    Trinity Medical split fees with its biller, Jagroop Singh.

353.    True and accurate excerpts from testimony of Brown are contained below:

Q    Who does your billing?

A    I have Advanced -- oh, God, what's the name?  Advanced-something, that's one.  And the other one is Jagroop, J-A-G-R-O-O-P; that's an individual's name.

Q    Jagroop?

A    Mm-hmm.

Q    No first or last name?

A    Last name is Singh, S-I-N-G-H.

Q    Jagroop Singh.  Okay.

     Is Jagroop Singh related to the Singh that you share office space with?

A    I don't believe so, but he

     He does the billing for that office.

Q    I meant to ask you this earlier.  Your part-time front desk person --

A    Navi?

Q    -- is she related to the Singh that you share office space with?

A    She's related to the biller.

Q    She's related to Jagroop Singh?

A    Right.

Q    How are they related?

A    Brother and sister.

```
     Q        Do you pay him directly for
doing your billing?
     A        Yes, he's paid directly.
     Q        Is he a W-2 employees?
     A        Not an employee.
     Q        How much is he paid?
     A        It depends on how much is
reimbursed.
     Q        What would the rate be?
     A        It's, like, I think seven
percent.
     Q        Seven percent of reimbursement
is how much he's paid?
     A        Right.  Whatever's paid; then he
gets seven percent, mm-hmm.
```

354.    The Defendants engaged in illegal fee splitting of every claim submitted to Liberty Mutual in violation of state and local licensure laws.

355.    Liberty Mutual is not required to pay Trinity Medical for healthcare services because the Defendants illegally split fees with non-healthcare providers and it is entitled to reimbursement for payments they were induced to make by Trinity Medical's fraudulent submissions.

356.    All of the bills submitted by Trinity Medical that were submitted by the Defendants through the U.S. Mail seeking payment from Liberty Mutual were made to illegally reimburse non-healthcare providers  through unlawful fee splitting and are therefore fraudulent.

### G.    UNLAWFUL PROVISION OF UNNECESSARY MEDICAL SERVICES

357.    Liberty Mutual Claimants were ordered to undergo unnecessary injections and other treatments.

358.    Eligible patients can collect No-Fault payments to cover their "basic economic loss" which includes lost wages and ***necessary*** medical expenses up to $50,000.00. *See* N.Y. Ins. Law § 5102.

359.    As assignees of the patients, the Defendants are only entitled to collect No-Fault payments for services that are medically necessary and related to an automobile accident.

360.    The American Medical Association defines medical necessity as: "healthcare services or products that a prudent physician would provide to a patient for the purpose of preventing, diagnosing or treating an illness, injury, disease, or symptoms in a manner that is (a) in accordance, with generally accepted standards of medical practice; (b) clinically appropriate in terms of type, frequency, extent, site, and duration; and (c) not primarily for the economic benefit of the health plans and purchasers or for the convenience of the patient, treating physician, or other health care provider" (Institute of Medicine, Committee on Defining and Revising an Essential Health benefits Package for Qualified Health Plan (2011)).

361.    Healthcare providers are ineligible to collect No-Fault payments for medically unnecessary services.

362.    The Provider Defendants violated applicable licensing requirements by billing for medically unnecessary services—it is professional misconduct for a physician to (1) order excessive and unwarranted tests or treatment not warranted by the condition of the patient; (2) fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient; or (3) practice medicine in a fraudulent manner. *See* N.Y. Educ. Law § 6530.

363.    Liberty Mutual Claimants were subjected to unnecessary services, including evaluations, outcome assessment testing, physical therapy treatment, and injections.

364.    However, the documentation submitted to Liberty Mutual by the Defendants routinely misrepresented that the billed-for services were performed in a legitimate manner.

365.    Because of their misconduct, the Defendants violated applicable laws and licensing regulations, and are not eligible to collect No-Fault payments.

### 1.    Fraudulent Treatment Protocol

366.    As a crucial part of this scheme, the Provider Defendants rendered and then sought payment for fraudulent treatment, tests, and injections provided to patients.

367.    Indeed, the Defendants intentionally designed this scheme to ensure that patients were subjected to numerous treatments for prolonged periods regardless of whether the patients needed—or even wanted-these services.

368.    The Provider Defendants were not entitled to No-Fault reimbursement for these treatment, tests, and injections because they were excessive, medically unnecessary, and rendered pursuant to a pre-determined treatment protocol for the primary purpose of collecting payments from Liberty Mutual.

369.    Overall, the Provider Defendants were vital to this scheme because the entities could be used to deliver a wide range of healthcare treatment, tests, and services to patients, which could then be billed to insurers like Liberty Mutual.

370.    In addition to the provision of medically unnecessary healthcare tests and services, Ahuja utilized unlawful referral arrangements between the Provider Defendants.

371.    Trinity Medical made illegal "kickback" payments to Ahuja (disguised as rent) in exchange for patient referrals.

372.    In addition to the provision of medically unnecessary healthcare treatment, tests, and services, Ahuja utilized unlawful referral arrangements between the Provider Defendants that provided medically unnecessary services to patients.

373.    The documents and invoices created and submitted to Liberty Mutual by (or on behalf of) the Provider Defendants routinely misrepresented that the billed-for services were performed in a legitimate and clinically reasonable manner.

374.    As alleged herein, not only has this scheme injured Liberty Mutual, but the defendants purposeful provision of excessive and clinically unwarranted care also compromised the well-being of the patients that were subjected to these grossly unnecessary treatment, tests, and services.

375.    Because of the misconduct described below, none of the Provider Defendants' claims for No-Fault reimbursement under Insurance Law § 5102 are—or ever were—compensable.

376.    To generate as much billing as possible, Ahuja devised and implemented a protocol of excessive treatment over a prolonged period of time—treatment that was not medically indicated for the Provider Defendants' patients, especially where the patients were only suffering from soft-tissue injuries caused by minor motor vehicle accidents.

377.    Indeed, the treatment records of Liberty Mutual Claimants treating with one or more of the Provider Defendants, when viewed as a whole, reveal an unmistakable and egregious pattern of over-treatment.

378.    The pattern of treatment typically commenced with the Liberty Mutual Claimant presenting at the 94-13 120th Street Clinic.

379.    The initial and follow-up evaluations were invariably utilized to refer patients for

outcome assessment testing, physical therapy, and injections, thereby ensuring that each patient generated as much billing as possible.

380.    Each examination concluded with the examining practitioner reporting a nearly identical plan of care for each patient, including physical therapy treatment three (3) to four (4) times a week for at least four (4) weeks followed by a reassessment.

381.    A true and accurate representation of the typical plan of care is depicted below:





382.    Trinity Medical also concurrently billed Liberty Mutual for an outcome assessment test with initial evaluations and follow-up evaluations.

383.     A true and accurate representation of outcome assessment tests billed to Liberty

Mutual are depicted below:



**PROVIDER'S NAME AND ADDRESS:**
**TRINITY MEDICAL HEALTHCARE SERVICES, PC**
PO BOX 13-1709
STATEN ISLAND, NY 10313          Tel:

15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | | FEE SCHEDULE TREATMENT CODES | TOTAL CHARGE |
|---|---|---|---|---|---|
| 8/31/21 | 9413 120 STREET SUITE 1 QUEENS, NY | - 59  Inj tendon single ligaments 1 or 2 | x 1 | 20552 | $118.41 |
| 8/31/21 | 9413 120 STREET SUITE 1 QUEENS, NY | - 59  Inj tendon single ligaments 1 or 2 | x 1 | 20552 | $118.41 |
| 8/31/21 | 9413 120 STREET SUITE 1 QUEENS, NY | - Office Visit Lev 5 | x 1 | 99205      25 | $275.00 |
| 8/31/21 | 9413 120 STREET SUITE 1 QUEENS, NY | - Outcome Assessment Test | x 1 | 99358 | $280.12 |
| | | | | TOTAL CHARGES TO DATE : | $791.94 |

16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING:

| Treating Provider's Name | Title | License or Certificate No. | Business Relation ( check applicable box) | | |
|---|---|---|---|---|---|
| | | | Employee | Independent Contractor | Other (specify) |
| BROWN,PAULA | M.D. | 239137 | | | Owner |

**PROVIDER'S NAME AND ADDRESS:**
**TRINITY MEDICAL HEALTHCARE SERVICES, PC**
PO BOX 13-1709
STATEN ISLAND, NY 10313          Tel:

15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | | FEE SCHEDULE TREATMENT CODES | TOTAL CHARGE |
|---|---|---|---|---|---|
| 9/21/21 | 9413 120 STREET SUITE 1 QUEENS, NY | - Shock Wave | x 1 | 0101T | $700.39 |
| 9/21/21 | 9413 120 STREET SUITE 1 QUEENS, NY | - Shock Wave | x 1 | 0101T | $700.39 |
| 9/21/21 | 9413 120 STREET SUITE 1 QUEENS, NY | - 59  Inj tendon single ligaments 1 or 2 | x 1 | 20552 | $118.41 |
| 9/21/21 | 9413 120 STREET SUITE 1 QUEENS, NY | - 59  Inj tendon single ligaments 1 or 2 | x 1 | 20552 | $118.41 |
| 9/21/21 | 9413 120 STREET SUITE 1 QUEENS, NY | - FollowUp Lev 5 | x 1 | 99215 | $203.76 |
| 9/21/21 | 9413 120 STREET SUITE 1 QUEENS, NY | - Outcome Assessment Test | x 1 | 99358 | $280.12 |
| | | | | TOTAL CHARGES TO DATE : | $2,121.48 |

16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING:

| Treating Provider's Name | Title | License or Certificate No. | Business Relation ( check applicable box) | | |
|---|---|---|---|---|---|
| | | | Employee | Independent Contractor | Other (specify) |
| BROWN,PAULA | M.D. | 239137 | | | Owner |

384.     These identical treatment plans caused Liberty Mutual Claimants to receive

physical therapy treatment at Singh PLLC several times per week for months on end.

385.    Typically, the initial and follow-up evaluations would also refer patients for injections.

386.    Overall, the continued conservative care over extended periods of time is excessive, and not medically necessary for the management of patients' soft-tissue sprains and strains.

387.    To the extent that Liberty Mutual paid the Provider Defendants in reliance on the documents created and submitted to Liberty Mutual by the Provider Defendants in connection with any patient examinations and consultations used to justify the performance of excessive, medically unnecessary, concurrent physical therapy, including, but not limited to, those payments listed in Exhibits 1-2, Liberty Mutual is entitled to recover all payments made to the Provider Defendants in connection with any such services.

388.    Additionally, to the extent that any of the Provider Defendants' charges submitted in connection with these services remain unpaid, Liberty Mutual is under no obligation to make any payments in connection with those transactions because those services were excessive, not warranted, and therefore not compensable under New York's No-Fault laws.

### 2.    Outcome Assessment Testing

389.    Patients treating with Trinity Medical routinely underwent "Outcome Assessment," which was billed under CPT Code 99358 at $280.12.  *See* Exhibit 8.

390.    These Outcome Assessment tests were multi-page questionnaires, which the patients filled out on tablets describing their pain.

391.    Upon information and belief, these outcome assessment questionnaires did not use standardized outcome assessment tools, such as the Revised Oswestry Back Disability Questionnaire, the Roland-Morris Questionnaire, the Headache Disability Index, the Neck Disability Index Questionnaire, the Shoulder Pain and Disability Index, and/or the Subjective Knee Score Questionnaire.

392.    Scoring and tabulating a standard Outcome Assessment questionnaire can be accomplished by anyone in a physician's office in a matter of minutes.

393.    For this reason, when physicians utilize Outcome Assessment tools, they are typically included in the bill for the overall evaluation conducted on that date of service.

394.    Trinity Medical, however, routinely billed for both an office visit **_and_** an "Outcome Assessment" using separate CPT codes.

**PROVIDER'S NAME AND ADDRESS:**
**TRINITY MEDICAL HEALTHCARE SERVICES PC**
PO BOX 13-1709
STATEN ISLAND, NY 10313        Tel:

15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | | FEE SCHEDULE TREATMENT CODES | TOTAL CHARGE |
|---|---|---|---|---|---|
| 4/10/23 | 9413 120 STREET SUITE 1 QUEENS, NY | - Office Visit Lev 5 | x  1 | 99205    25 | **$275.00** |
| 4/10/23 | 9413 120 STREET SUITE 1 QUEENS, NY | - Outcome Assessment Test | x  1 | 99358 | **$280.12** |
| | | | | TOTAL CHARGES TO DATE : | **$555.12** |

16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING:

| Treating Provider's Name | Title | Licence or Certificate No. | Business Relation ( check applicable box) | | |
|---|---|---|---|---|---|
| | | | Employee | Independent Contractor | Other (specify) |
| BROWN, PAULA | M.D. | 239137 | | | Owner |

395.    There is **_no_** CPT code that describes the procedure "Outcome Assessment."

396.    Trinity Medical's routine billing of the procedure using the separate CPT Code

99358 on the same date of service was inappropriate, as this code is used for the review of records on a ***different date*** than a patient's primary evaluation and management service.

397.    Brown admitted that Trinity Medical discontinued billing for Outcome Assessment testing.

398.    True and accurate excerpts from testimony of Brown are contained below:

> Q      What's the criteria for doing
> this test when you do do it?
> A      Basically it's just a standard
> initial test that, at times, would be
> done.   But basically, it's not really done
> anymore.

What's the criteria for it?
Like, why would you do it?

        A    I would do it for basic -- when the patient comes in, you know, I meet them, they would answer the questionnaire, and -- so that I can compare, you know, what -- how they answer with what I'm getting feedback-wise, and see how they progress along through the process of being in my care.

            So basically before, everybody would get it, and it would continue maybe one to three more times after that.

        Q    So everybody got it at one point?

        A    Yeah, basically.

Q    Is it encompassed -- is the outcome assessment test encompassed by an initial evaluation?

A    You mean that if it's done -- what exactly are you asking?

Q    So from what you've told me -- and I don't want to mischaracterize your testimony, this is what I heard -- you give this to patients to determine how they're going to do with your treatment; right?

A    How they're doing, mm-hmm.

Q    How they're doing, okay.

Isn't that what the initial evaluation is for?

A    Yeah, mm-hmm.

> Q    But doesn't this say that asking the patient for their input on a questionnaire actually is not as objective?
>
> A    Right.  And basically, this whole conversation about the O.A. basically, it's not being done anymore basically, so it's like a moot point, so, because -- I know that, basically, it's something that you know.

399.    Accordingly, to the extent that Liberty Mutual paid Trinity Medical in reliance on documents created and submitted to Liberty Mutual in connection with medically unnecessary Outcome Assessment services, including, but not limited to, those payments listed in Exhibit 2, Liberty Mutual is entitled to recover all payments made in connection with any such services.

400.    To the extent that any of Trinity Medical's charges submitted in connection with medically unnecessary Outcome Assessment services remain unpaid, Liberty Mutual is under no obligation to make any payments in connection with those transactions.

### H.    FRAUDULENT BILLING FOR INITIAL EXAMINATIONS AND CONSULTATIONS

401.    The initial examinations billed for by Trinity Medical were an essential component in the scheme to defraud Liberty Mutual through the performance of unnecessary physical therapy and injections.

402.    In most cases, Trinity Medical used these examinations to justify the improper referral for medically unnecessary and worthless treatment performed by the Provider Defendants.

403.    Trinity Medical's charges for initial examinations were false and fraudulent because the examinations and consultations were always perfunctory and lacking the necessary substance to bill at high level CPT codes.

404.    Providers must correctly identify the procedure performed when seeking payment under New York's No-Fault laws.

405.    Generally, the Fee Schedule's reimbursement rates are determined by considering the (a) physician work associated with the procedure, (b) the practice expense associated with providing the service, and (c) the malpractice expense.

406.    Reimbursement for medical services is directly proportionate to the level of the CPT code billed (i.e., the higher the level of the CPT code billed, the greater amount of reimbursement).

407.    Billing a service at a higher level CPT code than actually performed, for the purpose of receiving greater reimbursement, is an example of a fraudulent billing practice and such charges are not compensable.

408.    The invoices submitted to Liberty Mutual by Trinity Medical included CPT codes for initial examinations that were not performed consistently with the AMA's CPT requirements.

409.    By creating, or causing the creation of, medical bills that included CPT codes, then causing such invoices to be submitted to Liberty Mutual, Trinity Medical represented to Liberty Mutual that the invoiced medical services were performed in conformity with the AMA's CPT guidelines.

410.    However, many of the bills prepared and submitted by Trinity Medical contained improper and/or intentionally deceptive CPT codes.

411.    In some cases, in reasonable reliance on the documentation submitted by Trinity Medical, Liberty Mutual made payments to Trinity Medical for said medical services.

412.    In other cases, Trinity Medical has submitted invoices demanding payment for such services, and such invoices remain unpaid or have been denied by Liberty Mutual.

413.    For the reasons explained below, none of these initial examinations were compensable under New York's No-Fault law as represented by Trinity Medical.

### 1.    Initial Examinations/Office Visits

414.    Trinity Medical billed for initial patient examinations at high-level codes, including CPT codes 99204 and 99205.

415.    However, these charges were false and fraudulent because by using these CPT codes, Trinity Medical made several misrepresentations about the nature and extent of these examinations and evaluations.

416.    For example, any charges for examinations submitted under CPT codes 99204 and 99205 must meet the criteria listed below:

| CPT Code | History | Examination | Medical Decision Making | Face to Face Time |
|---|---|---|---|---|
| 99201 | Problem Focused | Problem Focused | Straight forward | 10 minutes |
| 99202 | Expanded Problem Focused | Expanded Problem Focused | Straight forward | 20 minutes |
| 99203 | Detailed | Detailed | Low complexity | 30 minutes |
| 99204 | Comprehensive | Comprehensive | Moderate complexity | 45 minutes |
| 99205 | Comprehensive | Comprehensive | High complexity | 60 minutes |

417.    A charge for an examination classified under CPT code 99204 must necessarily include (a) a comprehensive history, (b) a comprehensive examination, and (c) medical decision making of moderate complexity.

418.    A charge for an examination classified under CPT code 99205 must necessarily include (a) a comprehensive history, (b) a comprehensive examination, and (c) medical decision making of high complexity.

419.    If any of the three (3) key components are not met, CPT codes 99204 and 99205 are not supported.

420.    In the case of such patient examinations, the factors considered to determine the "complexity" of medical decision making when assigning a proper CPT code designation include:

| Type of Decision Making | Number of Diagnoses or Management Options | Amount and/or Complexity of Data To Be Reviewed | Risk of Complications and/or Morbidity or Mortality |
|---|---|---|---|
| Straight forward medical decision making (CPT 99201 and 99202) | Minimal | Minimal or none | Minimal |
| Low complexity decision making (CPT 99203) | Limited | Limited | Low |
| Moderate complexity medical decision making (CPT 99204) | Multiple | Moderate | Moderate |
| High complexity decision making (CPT 99205) | Extensive | Extensive | High |

421.    To qualify for a given type of decision making, two (2) of the three (3) elements in the table must be met or exceeded.

422.    The presenting problem(s) warranting CPT code 99204 are also usually of moderate severity.

423.    Additionally, physicians typically spend forty-five (45) minutes of face-to-face time with the patient and/or family when billing under CPT code 99204.

424.    The presenting problem(s) warranting CPT code 99205 are also usually of high severity.

425.    Additionally, physicians typically spend between sixty (60) and seventy-four (74) minutes of face-to-face time with the patient and/or family when billing under CPT code 99205.

426.    Because Trinity Medical's examinations were actually minimal and insubstantial, their representations about the nature and extent of the services were false, and the charges based on these misrepresentations were likewise false.

427.    Indeed, the records submitted by Trinity Medical regarding these office visits rather support billing under either CPT code 99201 (for an examination with (a) a problem focused history, (b) a problem focused examination, and (c) straightforward medical decision making) or CPT code 99202 (for an examination with (a) an expanded problem focused history, (b) an expanded problem focused examination, or (c) low complexity of medical decision making).

428.    During the relevant period, Trinity Medical submitted and/or caused to be submitted claims to Liberty Mutual based on these records.

429.    Brown admitted to only billing CPT codes 99204 or 99205 for initial evaluations.

430.    A true and accurate excerpt from testimony of Brown is contained below:

> Q      Do you know what C.P.T. codes you used for your initial evaluations?
>
> A      Sometimes, I believe 99205, and the one -- I'm not sure if it's 99204.
>
> Q      Did you ever use 99203 or 99202 or 99201?
>
> A      I think for the follow-ups it's 99214 or 99215.
>
> Q      So you only use the 99204 and 99205 codes, and 99214 and 99215 for reevaluations?
>
> A      Basically, yes.
>
> Q      When you say "basically" --
>
> A      Overall, mainly.

431.    The charts annexed at Exhibits 6-7 identify all of Trinity Medical's patients that purportedly received initial examinations/office visits that were billed at the CPT code 99204 and 99205 level.

432.    Based on the medical documentation submitted by Trinity Medical for each of the patients identified in Exhibits 6-7, none of the billing containing charges for CPT code 99204 or 99205 were warranted because the medical documentation submitted to Liberty Mutual by the Defendants for each of the patients fails to meet the minimum threshold necessary to bill CPT code 99204 or 99205.

433.     Because the nature and extent of the examinations purportedly provided to the patients identified in the chart annexed at Exhibits 6-7 were misrepresented, Trinity Medical is not entitled to collect payment for such services under New York's No-Fault laws.

434.     To the extent that Liberty Mutual paid Trinity Medical in reliance on the documents created and submitted in connection with these initial examinations/office visits, including, but not necessarily limited to, those services listed in Exhibits 6-7, Liberty Mutual is entitled to recover all payments made to Trinity Medical in connection with these misrepresented services.

435.     Moreover, to the extent that any of the charges remain unpaid or have been denied, Liberty Mutual is under no obligation to make any payments in connection with those transactions because the charges submitted by Trinity Medical in connection with these services are not compensable under New York's No-Fault laws for the reasons set forth above.

### 2.     Follow-Up Evaluations

436.     Virtually every patient treated by Trinity Medical underwent follow-up examinations during their course of treatment.

437.     In many cases, patients underwent a grossly excessive—and unnecessary—number of follow-up examinations.

438.     The bogus nature of these follow-up examinations is demonstrated by the fact that the corresponding patient reports contain an amalgamation of boilerplate language that bears little relationship to the actual clinical condition of the patient.

439.     In connection with every patient follow-up examination, Trinity Medical submitted bills for these examinations under CPT Code 99214 or 99215, with charges routinely exceeding $120.00 per examination under CPT Code 99214 and exceeding $200.00 per examination under CPT Code 99215.

440.    In addition to the fact that virtually every one of the follow-up examinations was unnecessary and nothing more than the Defendants' unlawful ploy to perpetuate referrals for medically unnecessary physical therapy and injections, the defendants' charges for patient follow-up examinations are also not compensable because Trinity Medical failed to document the necessary criteria required to bill re-evaluations under CPT codes 99214 and 99215.

441.    The chart annexed at Exhibit 9 identifies all of the patients treated by Trinity Medical who purportedly received follow-up examinations that were billed at the CPT code 99214 and 99215 level.

442.    Most notably, these patient follow-up examinations failed to document the necessary complexity of medical decision making required by CPT code 99214 and 99215.

443.    Because (a) the nature and extent of the follow-up examinations purportedly provided to the patients identified at Exhibit 9 were misrepresented, (b) these examinations were nothing more than a product of the defendants' scheme to inflate patient charges through the provision of excessive and unnecessary services, and (c) the services were falsely charged, the Defendants are not entitled to collect payment for such services under New York's No-Fault laws.

444.    Accordingly, to the extent Liberty Mutual paid the Defendants in reliance on the documents created and submitted in connection with these patient follow-up examinations, Liberty Mutual is entitled to recover all payments made to the defendants in connection with the follow-up examinations whereas the nature and extent of the examinations were materially represented and the services were falsely charged.

445.    Moreover, to the extent any of the charges itemized in Exhibit 9 remain unpaid or have been denied, Liberty Mutual is under no obligation to make any payments in connection with

those transactions because the charges submitted by the Defendants in connection with these services are not compensable under New York's No-Fault laws for the reasons set forth above.

446.    Accordingly, to the extent that Liberty Mutual paid Trinity Medical in reliance on documents created and submitted to Liberty Mutual in connection with medically unnecessary initial examination and consultation services, including, but not limited to, those payments listed in Exhibit 2, Liberty Mutual is entitled to recover all payments made in connection with any such services.

447.    To the extent that any of Trinity Medical charges submitted in connection with medically unnecessary initial examination and consultation services remain unpaid, Liberty Mutual is under no obligation to make any payments in connection with those transactions.

### 3.    Medically Unnecessary Examinations

448.    The Defendants used Trinity Medical to justify the subsequent unnecessary services, including injections.

449.    In many instances, according to the records submitted to Liberty Mutual, these claimants' injuries, if any, were nothing more than sprains or strains from which a patient would generally recover within approximately six (6) to twelve (12) weeks.

450.    However, the examinations billed to Liberty Mutual by Trinity Medical misrepresented facts about the patients' alleged injuries.

451.    In some instances, the diagnoses were inconsistent with the findings of the purported examination of the patient.

452.    Procedure orders were prematurely determined—sometimes just weeks after the accident—before the patients even had a chance to recover on their own.

453.    Overall, the services purportedly rendered through Trinity Medical created a false

justification for medically unnecessary—and excessively charged—pain management procedures.

### 4.   Medically Unnecessary Injections with Ultrasound Guidance

454.   Trinity Medical billed Liberty Mutual for injections with ultrasound guidance that were medically unnecessary, if they were performed at all.

455.   The performance of invasive procedures, including injections, must be based upon adequate diagnosis and a legitimate documented medical necessity.

456.   The Defendants inexplicably billed for injection procedures that are intended to be used for diagnostic purposes without using information gleaned from such procedures for any purpose.

457.   Consequently, patients received unjustified invasive procedures that offered little therapeutic or diagnostic efficacy while subjecting the patients to unnecessary risks of infection.

458.   It is highly unlikely that Liberty Mutual Claimants' suffered bilateral and multi-level spinal injuries from the minor motor vehicle accidents reported.

459.   Procedures that involve epidural steroid injections ("ESI"), trigger point injections ("TPI"), facet joint injections, sacroiliac joint injections, medial branch nerve blocks, and peripheral nerve blocks do not require sedation.

460.   Rather, only local anesthesia is indicated for interventional procedures, and many patients can undergo interventional pain procedures without the need for supplemental sedation in addition to local anesthesia.

461.   It was improper for Trinity Medical to bill ultrasound guidance with injections.

462.   A true and accurate example of billing by Trinity Medical is contained below:

PROVIDER'S NAME AND ADDRESS:
**TRINITY MEDICAL HEALTHCARE SERVICES PC**
PO BOX 13-1709
STATEN ISLAND, NY 10313          Tel:

15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | | FEE SCHEDULE TREATMENT CODES | TOTAL CHARGE |
|---|---|---|---|---|---|
| 10/28/22 | 9413 120 STREET SUITE 1 QUEENS, NY | - FollowUp Lev 5 | x 1 | 99215 | **$203.76** |
| 10/28/22 | 9413 120 STREET SUITE 1 QUEENS, NY | - 59  Inj tendon single ligaments 1 or 2 | x 1 | 20552 | **$118.41** |
| 10/28/22 | 9413 120 STREET SUITE 1 QUEENS, NY | - 59  Inj tendon single ligaments 1 or 2 | x 1 | 20552 | **$118.41** |
| 10/28/22 | 9413 120 STREET SUITE 1 QUEENS, NY | - Ultrasonic guidance for needle placement | x 1 | 76942 | **$289.20** |
| | | | | TOTAL CHARGES TO DATE : | **$729.78** |

463.    Specifically, Brown never actually diagnosed trigger points prior to performing the injections.

464.    Brown did not document that trigger points were present in her physical examinations.

465.    Trigger points can be defined as discrete palpable taut muscle bands that are painful when palpated.

466.    The definition of a trigger point requires triggering of the pain with palpation.

467.    Physically touching the trigger point is an essential part of the diagnosis.

468.    Simply seeing a tight muscle on ultrasound would not qualify as a trigger point.

469.    The performance of trigger points is part of the pre-determined treatment protocol.

470.    For example, in the initial examination of claimant J.C. (claim number 047386940), there is no area to denote the performance of trigger point injections.

471.    A true and accurate example of an examination of J.C. by Trinity Medical is contained below:

**Spinal Column Exam**

**CERVICAL SPINE**

(X)There appears to be tenderness of the cervical spine paraspinal muscles with spasm in ( )right (X)left paraspinal structures  and an (X)increase in ( )right (X)left muscle tone ( )paravertebral (X)trapezius ( )rhomboid muscles
( )Normal examination of the cervical spine

472.    Brown only notes spasm in a region, which does not directly translate into the presence of trigger points in a legitimate medical practice.

473.    All of the Liberty Mutual Claimants at Trinity Medical have similar spasms and increase in muscle tone.

474.    Brown uses this false documentation as the justification for trigger points.

475.    All of the trigger point injections billed in connection with injections identified in Exhibits 10-11 are unnecessary.

476.    Ultrasound guidance has no medical necessity since the taut band can be felt.

477.    The use of ultrasound guidance here has no purpose other than to artificially inflate the charges.

478.    The diagnosis section of the physical therapy referral for J.C. never includes a trigger point diagnosis.

479.    A true and accurate example of the diagnosis section for J.C. by Trinity Medical is contained below:

**Diagnosis:**

___ Cervical  Sprain / Strain          ___ Hand  Left / Right

___ Lumbar  Sprain / Strain           ___ Foot  Left / Right

___ Shoulder  Left / Right  Derangement   ___ Headaches

___ Elbow  Left / Right  Derangement

___ Wrist  Left / Right  Derangement

___ Hip  Left / Right  Derangement

___ Knee  Left / Right  Derangement

___ Ankle  Left / Right  Derangement

480.    If Brown or a healthcare professional at Trinity Medical identified taut muscle bands through palpation, then ultrasound guidance was an entirely unnecessary service.

481.    Brown claims that ultrasound guidance is necessary based on patient symptoms.

482.    True and accurate excerpts from testimony of Brown are contained below:

Q      Okay.

So -- and then Robert, when would he see the patients?

A      Basically just -- definitely when there's an injection that's going on. He helps with the ultrasound guidance in that respect for joint injections.

Q      When you say that "he helps," what do you mean?

A      Meaning that he has the probe placed so that we can, you know, confirm placement of the needle in the joint space.

Q      So for example, what would a specific diagnosis be that would clinically indicate the need for guided -- ultrasound-guided injections in a joint?

A      So basically, the first thing is how bad the pain is. Oftentimes people come in with pain everywhere, so I'm not going to stick them 20 times to help them. But if it's, like, one, two, three spots out of ten, whatever, then I would offer

> it to them if it's something that I think
> that is good to be done, and then the
> injection is done that way.

483.    All of the ultrasound guidance billed in connection with injections identified in Exhibit 12 are unnecessary.

484.    Patients must remain able to communicate pain or other adverse sensations or events during procedures such as spinal ESI, which involve the potential risk for injuries if the patient cannot communicate.

485.    Therefore, the bills for interventional pain management procedures are fraudulent and not compensable under New York law because the services were not medically necessary.

### 5.    Unnecessary Physical Therapy

486.    Ahuja devised this scheme to allow Singh PLLC to bill for unnecessary physical therapy services.

487.    Ahuja admitted that almost all motor vehicle accident victims suffered similar injuries.

488.    True and accurate excerpts from testimony of Ahuja are contained below:

> Q      So during the course of a
> conservative physical therapy, you
> wouldn't be required or obligated to

> conduct a reevaluation of the patient
> within, say, 30 or 60 days?
>
>     A    It's not obligated or
> requirement.  Yes, reevaluation is
> required, but I'm not able to do it.
>
>     Q    Why is that?
>
>     A    Because in motor vehicle
> accidents, the patient's symptoms remain
> almost the same on a daily basis, so
> reevaluation didn't get much results.

489.    Ahuja admitted that he instructed his patients to use a self-directed home exercise program after only two weeks.

490.    A true and accurate excerpt from testimony of Ahuja is contained below:

>     Q    Is it important to you that
> patients continue, like, a self-directed
> exercise program, like a home exercise
> plan?
>
>     A    Yes.
>
>     Q    At what point do you start to
> teach patients about the treatment that
> they could do on their own?
>
>     A    After two weeks.
>
>     Q    What?
>
>     A    After two weeks.

491.    Despite patients exercising at home, Ahuja does not believe that patients receive maximum benefit until they reach 15-20 treatments.

492.    A true and accurate excerpt from testimony of Ahuja is contained below:

```
    Q      How many -- after how many P.T.
visits would you say the patient gets the
maximum benefit?

    A      Fifteen to twenty visits they
should see some benefit regarding their
previous medical history or previous
history of low back pain.
```

493.    Yet, Singh PLLC submitted bills for far more treatment than 15-20 visits for unnecessary treatment after its patients reached maximum improvement.

494.    For example, at least 60 patients treated with Singh PLLC in excess of 100 visits:

| Claim No. | Claimant Initials | Date of Loss | Provider | Total Dates of Service |
|---|---|---|---|---|
| 0455934000000 | A.N. | 5/4/2021 | SINGH PT PLLC | 349 |
| 0455934000000 | G.N. | 5/4/2021 | SINGH PT PLLC | 342 |
| 0455934000000 | K.J. | 5/4/2021 | SINGH PT PLLC | 341 |
| 0472739000000 | R.R. | 10/17/2021 | SINGH PT PLLC | 325 |
| 0478245000000 | J.L. | 12/7/2021 | SINGH PT PLLC | 316 |
| 0501144310003 | C.S. | 7/9/2022 | SINGH PT PLLC | 308 |
| 0510272000000 | A.B. | 9/27/2022 | SINGH PT PLLC | 304 |
| 0487691000000 | C.C. | 2/27/2022 | SINGH PT PLLC | 301 |
| 0472739000000 | S.J. | 10/17/2021 | SINGH PT PLLC | 297 |
| 0510272000000 | N.R. | 9/27/2022 | SINGH PT PLLC | 292 |
| 0507415000000 | K.R. | 8/30/2022 | SINGH PT PLLC | 287 |
| 0484735000000 | A.A. | 1/27/2022 | SINGH PT PLLC | 283 |
| 0472739000000 | J.G. | 10/17/2021 | SINGH PT PLLC | 280 |
| 0446555000000 | J.I. | 1/20/2021 | SINGH PT PLLC | 279 |
| 0459891000000 | C.S. | 6/7/2021 | SINGH PT PLLC | 279 |

| Claim No. | Claimant Initials | Date of Loss | Provider | Total Dates of Service |
|---|---|---|---|---|
| 0484735000000 | A.A. | 1/27/2022 | SINGH PT PLLC | 274 |
| 0513186000000 | Y.J. | 10/23/2022 | SINGH PT PLLC | 273 |
| 0507274000000 | J.J. | 8/26/2022 | SINGH PT PLLC | 267 |
| 0507274000000 | K.L. | 8/26/2022 | SINGH PT PLLC | 263 |
| 0513186000000 | T.R. | 10/23/2022 | SINGH PT PLLC | 263 |
| 0507274000000 | A.M. | 8/26/2022 | SINGH PT PLLC | 260 |
| 0472739000000 | H.S. | 10/17/2021 | SINGH PT PLLC | 257 |
| 0486667000000 | J.J. | 2/24/2022 | SINGH PT PLLC | 253 |
| 0487649000000 | G.S. | 3/11/2022 | SINGH PT PLLC | 250 |
| 0467143000000 | R.L. | 8/27/2021 | SINGH PT PLLC | 248 |
| 0497250000000 | K.H. | 5/25/2022 | SINGH PT PLLC | 246 |
| 0523059440003 | A.J. | 1/22/2023 | SINGH PT PLLC | 246 |
| 0458123000000 | R.J. | 5/30/2021 | SINGH PT PLLC | 243 |
| 0446043000000 | R.H. | 1/24/2021 | SINGH PT PLLC | 242 |
| 0507415000000 | E.G. | 8/30/2022 | SINGH PT PLLC | 241 |
| 0486667000000 | A.J. | 2/24/2022 | SINGH PT PLLC | 237 |
| 0525293000000 | S.S. | 2/13/2023 | SINGH PT PLLC | 237 |
| 0466197000000 | P.C. | 7/30/2021 | SINGH PT PLLC | 235 |
| 0523059440002 | D.K. | 1/22/2023 | SINGH PT PLLC | 234 |
| 0462527000000 | C.P. | 7/1/2021 | SINGH PT PLLC | 233 |
| 0440508000000 | R.K. | 11/12/2020 | SINGH PT PLLC | 232 |
| 0488271000000 | J.A. | 3/16/2022 | SINGH PT PLLC | 220 |
| 0509975340001 | R.H. | 9/24/2022 | SINGH PT PLLC | 210 |
| 0488725000000 | B.W. | 3/21/2022 | SINGH PT PLLC | 208 |
| 0529995000000 | D.H. | 3/28/2023 | SINGH PT PLLC | 207 |
| 0473869000000 | J.C. | 10/27/2021 | SINGH PT PLLC | 205 |
| 0446555000000 | J.D. | 1/20/2021 | SINGH PT PLLC | 193 |
| 0489894000000 | K.F. | 3/31/2022 | SINGH PT PLLC | 192 |
| 0535038000000 | M.J. | 4/30/2023 | SINGH PT PLLC | 192 |
| 0514990930008 | C.S. | 11/8/2022 | SINGH PT PLLC | 189 |
| 0541155000000 | K.C. | 6/26/2023 | SINGH PT PLLC | 181 |
| 0541155000000 | R.B. | 6/26/2023 | SINGH PT PLLC | 181 |
| 0535038000000 | K.K. | 4/30/2023 | SINGH PT PLLC | 179 |
| 0538575000000 | P.E. | 6/16/2023 | SINGH PT PLLC | 178 |
| 0510149110001 | A.S. | 9/14/2022 | SINGH PT PLLC | 176 |
| 0538575000000 | C.E. | 6/16/2023 | SINGH PT PLLC | 175 |
| 0514990930002 | S.T. | 11/8/2022 | SINGH PT PLLC | 164 |

| Claim No. | Claimant Initials | Date of Loss | Provider | Total Dates of Service |
|---|---|---|---|---|
| 0515656000000 | L.D. | 11/11/2022 | SINGH PT PLLC | 154 |
| 0464332000000 | L.S. | 7/29/2021 | SINGH PT PLLC | 148 |
| 0465649000000 | R.T. | 8/13/2021 | SINGH PT PLLC | 130 |
| 0488725000000 | D.S. | 3/21/2022 | SINGH PT PLLC | 120 |
| 0489894000000 | D.J. | 3/31/2022 | SINGH PT PLLC | 108 |
| 0535038000000 | R.T. | 4/30/2023 | SINGH PT PLLC | 102 |
| 0554911590004 | D.W. | 11/29/2023 | SINGH PT PLLC | 102 |
| 0422634000000 | M.G. | 3/6/2020 | SINGH PT PLLC | 101 |

495.    In total, of the 109 Liberty Mutual Claimants who treated with Singh PLLC, at least 93 Liberty Mutual Claimants allegedly treated over 20 times with Singh PLLC, well beyond the maximum benefit described by Singh PLLC. *See* Exhibit 13.

496.    Brown admitted that she refers every patient to physical therapy if there is a physical therapist at her clinic location, regardless of patient need.

497.    True and accurate excerpts from testimony of Brown are contained below:

Q    So when you make recommendations at an initial evaluation and you document them -- right -- you indicated that you recommend physical therapy at all of the locations because they have a physical therapist; is that right?

A    Yes.

Q    Do you recommend chiropractic?

A    If they're there, yes.

Q    If they're there?

A    Yes.

Q    Would there be any other circumstances that you would or would not refer to chiropractic?

A    Yeah, I don't have to refer to chiro, but if they're there, I check it off on my note.

Q    So the physical therapist and

> chiro -- if a patient comes into a
> facility that you're at and there's a
> physical therapist and a chiropractor at
> that location, you will refer them to
> physical therapy and chiropractic; is that
> correct?
>
> A    Right, mm-hmm.

498.    In addition, Singh PLLC followed the pre-determined treatment protocol even when it was contraindicated for patient care.

499.    For example, Singh PLLC submitted billing for electrical stimulation under CPT Code 97014 in the amount of $25.40 per service in connection with claimant G.M. (claim number 055382289).

500.    A true and accurate example of billing by Singh PLLC is contained below:

PROVIDER'S NAME AND ADDRESS:
SINGH PT PLLC
9413 120 STREET SUITE 1
QUEENS, NY 11419                Tel: 718-530-8881

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | FEE SCHEDULE TREATMENT CODES | CHARGE FOR EACH PROCEDURE | TOTAL CHARGE PER DAY |
|---|---|---|---|---|---|
| 11/14/2023 | 9413 120 STREET SUITE 1 QUEENS, NY | PT Evaluation | 97161 | $90.44 | $90.44 |
| 11/14/2023 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | $71.05 |
| 11/15/2023 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | $108.96 |
| 11/16/2023 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | $108.96 |
| 11/17/2023 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | $108.96 |
| 11/20/2023 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | $108.96 |

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | FEE SCHEDULE TREATMENT CODES | CHARGE FOR EACH PROCEDURE | TOTAL CHARGE PER DAY |
|---|---|---|---|---|---|
| 11/21/2023 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | $108.20 |
| 11/22/2023 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | $108.96 |
| 11/24/2023 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | $108.96 |
| 11/27/2023 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | $108.96 |
| 11/28/2023 | 9413 120 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | |
| | 9413 120 STREET SUITE 1 QUEENS, NY | Neuromuscular Reeducation | 97112 | $37.15 | $108.20 |

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICES RENDERED | FEE SCHEDULE TREATMENT CODES | CHARGE FOR EACH PROCEDURE | TOTAL CHARGE PER DAY |
|---|---|---|---|---|---|
| 11/30/2023 | 9413 130 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | $108.96 |
| 12/01/2023 | 9413 130 STREET SUITE 1 QUEENS, NY | Hot pack | 97010 | $5.25 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Electrical stimulation | 97014 | $25.40 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Therapeutic exercises | 97110 | $37.91 | |
| | 9413 130 STREET SUITE 1 QUEENS, NY | Myoficial Release | 97140 | $40.40 | $108.96 |
| | | | | TOTAL CHARGES TO DATE : | $1,358.53 |

501.    Ahuja admitted that the electrical stimulation treatment was contraindicated because G.M. had a pacemaker.

502.    True and accurate excerpts from testimony of Ahuja are contained below:

Q    Say, for example, electrical stimulation, would somebody with a pacemaker be a candidate to have electrical pads put on them with electrical shock?

A    No, that's a contraindication.

Q    So you would not bill for or put electrical stimulation on a patient who has a pacemaker; is that correct?

A    Pacemakers are a contraindication in the medical guidelines for physical therapy.

Q    So a pacemaker is a contraindication; is that correct?

A    And there's a lot of other contraindications, like active infection, lymphedema, pregnancy, hypertension.

Q    I mean, it's -- let's just say this. It's contraindicated to give somebody with a pacemaker electrical stimulation; correct?

A    Yes.

503.    Ahuja admitted that the electrical stimulation treatment was contraindicated because G.M. had atrial fibrillation.

504.    True and accurate excerpts from testimony of Ahuja are contained below:

```
Q       How about Afib?

A       Contraindication.
```

505.    Liberty Mutual is not required to pay Singh PLLC for physical therapy treatment that was not medically necessary and it is entitled to reimbursement for payments it was induced to make by Singh PLLC's fraudulent submissions.

506.    All of the bills submitted by Singh PLLC that were submitted by the Defendant through the U.S. Mail seeking payment from Liberty Mutual for treatment that was not medically necessary are fraudulent.

## V.    SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

507.    Throughout the course of this entire scheme, the Defendants (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

508.    Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, letters, and invoices in connection with the insurance claims referenced throughout this pleading traveled though the U.S. Mail.

509.    Every automobile insurance claim detailed within this Complaint involved at least

two uses of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claim-related payments, and the return of the cancelled payment instruments to the financial institution(s) from which the draft(s) were drawn.

510.    The Defendants either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing patient medical records, prescriptions, bills, invoices, and other No-Fault claim documents from the Provider Defendants to be mailed to Liberty Mutual, or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

**A.    SINGH PLLC ENTERPRISE**

511.    The Defendants personally used the U.S. Mail (or caused the U.S. Mail to be used) to further the fraudulent scheme by causing medical bills and records from Singh PLLC and Trinity Medical to be mailed to Liberty Mutual and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

512.    The Defendants (and/or other persons working at their direction and/or on their behalf) caused the Provider Defendants to falsely certify that they were, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that the Provider Defendants mailed a demand for payment (i.e., invoice) to Liberty Mutual.

513.    The Defendants' (and/or their agents') provision of excessive and medically unnecessary healthcare services provided pursuant to unlawful referral arrangements to patients of the Provider Defendants rendered them completely ineligible for No-Fault reimbursement under New York law.

514.    Ahuja admitted that Singh PLLC used the mail.

515.    True and accurate excerpts from testimony of Ahuja are contained below:

```
Q    Do you mail those records?
A    Yes, I do.
```

```
Q    Who mails them?
```

```
A    I do myself.
Q    You put them in the mail
physically?
A    Yes.
```

516.    Because the Provider Defendants were not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, the Defendants (and/or other persons working at their direction and/or on their behalf) purposely caused the Provider Defendants to make a misrepresentation each and every time that they mailed a document to Liberty Mutual claiming eligibility for No-Fault reimbursement.

517.    The Defendants committed mail fraud through the Singh PLLC enterprise because (a) Singh PLLC was not lawfully eligible to seek or collect No-Fault benefit payments; (b) the Provider Defendants were caused to seek No-Fault reimbursement from Liberty Mutual even though Singh PLLC was not entitled to such reimbursement; (c) the Provider Defendants used (or were caused to use) the U.S. Mail to seek No-Fault reimbursement; and (d) Singh PLLC made unlawful referrals to all the other Provider Defendants at the direction of Ahuja to allow them to bill Liberty Mutual in furtherance of this scheme.

518.    Moreover, because (a) the Provider Defendants were not lawfully eligible to seek or collect No-Fault benefit payments, (b) the Defendants (and/or other persons working at their direction and/or on their behalf) caused the Provider Defendants to seek No-Fault reimbursement from Liberty Mutual (even though the Provider Defendants were not entitled to such reimbursement), and (c) the Provider Defendants used the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through the Singh PLLC enterprise.

519.    At all relevant times, the Defendants knew that Singh PLLC, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, and/or Liberty Mutual would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Singh PLLC.

520.    Liberty Mutual estimates that the unlawful operation of the Singh PLLC enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 14 and incorporated by reference as if set forth in its entirety.

**B.    TRINITY MEDICAL ENTERPRISE**

521.    The Defendants personally used the U.S. Mail (or caused the U.S. Mail to be used) to further the fraudulent scheme by causing medical bills and records from Singh PLLC and Trinity Medical to be mailed to Liberty Mutual and/or counsel for patients, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

522.    The Defendants (and/or other persons working at their direction and/or on their behalf) caused the Provider Defendants to falsely certify that they were, in all respects, eligible to be reimbursed under New York's No-Fault Laws each time that the Provider Defendants mailed a demand for payment (i.e., invoice) to Liberty Mutual.

523.    The Defendants' (and/or their agents') provision of excessive and medically unnecessary healthcare services provided pursuant to unlawful referral arrangements to patients of the Provider Defendants rendered them completely ineligible for No-Fault reimbursement under New York law.

524.    Because the Provider Defendants were not lawfully eligible to seek or collect No-Fault benefit payments under New York's No-Fault laws, the Defendants (and/or other persons working at their direction and/or on their behalf) purposely caused the Provider Defendants to make a misrepresentation each and every time that they mailed a document to Liberty Mutual claiming eligibility for No-Fault reimbursement.

525.    The Defendants committed mail fraud through the Trinity Medical enterprise because (a) Trinity Medical was not lawfully eligible to seek or collect No-Fault benefit payments; (b) the Provider Defendants were caused to seek No-Fault reimbursement from Liberty Mutual even though Trinity Medical was not entitled to such reimbursement; (c) the Provider Defendants used (or were caused to use) the U.S. Mail to seek No-Fault reimbursement; and (d) Trinity Medical made unlawful referrals to all of the other Provider Defendants at the direction of Ahuja to allow them to bill Liberty Mutual in furtherance of this scheme.

526.    Moreover, because (a) the Provider Defendants were not lawfully eligible to seek or collect No-Fault benefit payments, (b) the Defendants (and/or other persons working at their direction and/or on their behalf) caused the Provider Defendants to seek No-Fault reimbursement from Liberty Mutual (even though the Provider Defendants were not entitled to such reimbursement), and (c) the Provider Defendants used the U.S. Mail to seek reimbursement, it is clear that these Defendants committed mail fraud through the Trinity Medical enterprise.

527.    At all relevant times, the Defendants knew that Trinity Medical, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, and/or Liberty Mutual would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Trinity Medical.

528.    Liberty Mutual estimates that the unlawful operation of the Trinity Medical enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 15 and incorporated by reference as if set forth in its entirety.

## VI.    SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE TO AND RELIED UPON BY LIBERTY MUTUAL

529.    The Defendants falsely certified that the Provider Defendants were eligible to be reimbursed as a means to induce Liberty Mutual to promptly pay charges related to healthcare treatment, tests, DME equipment, prescription drugs, and services purportedly provided to Liberty Mutual claimants.

530.    Indeed, the Provider Defendants attested to the medical necessity of the services that they allegedly performed as well as the validity of the charges for such services.

531.    The Provider Defendants were legally obligated to act honestly and with integrity, and were also legally obligated to act in accordance with every aspect of their oath as licensed physicians.

532.    The Defendants caused the Provider Defendants to submit to Liberty Mutual documents and bills for (a) services that were not provided in violation of state and local licensure law; (b) billed for services not rendered; (c) billed in connections with forged prescriptions; (d) services that involved unlawful referrals and undisclosed financial arrangements; (e) services that

were not medically necessary; and, (f) charges that exceeded the amounts allowed under the applicable Fee Schedule.

533.    Such conduct is unlawful.

534.    Many of the unlawful acts are not readily evidenced within the four corners of documentation submitted to Liberty Mutual by the Defendants and upon which Liberty Mutual relied in adjusting the claims and tendering payment in connection with each discrete patient claim.

535.    Claims submitted by the Provider Defendants to Liberty Mutual can only be submitted, and reimbursed, for services that were provided in accordance with all applicable New York state licensing requirements.

536.    Thus, every time that the Defendants submitted billing to Liberty Mutual by the Provider Defendants, they certified that the Provider Defendants were eligible to be reimbursed.

537.    The Defendants' purposeful concealment of the Provider Defendants' lack of eligibility for No-Fault reimbursement allowed the scheme to continue undetected.

538.    For example, the Defendants undertook steps to prevent detection of this scheme by causing the Provider Defendants to operate as seemingly separate enterprises to conceal the volume of billing submitted to Liberty Mutual by these enterprises, when, in actuality, the Defendants treated the Provider Defendants as one homogenous business interest in disregard of their individual corporate forms.

539.    Consequently, the full extent of the Defendants' fraudulent acts relative to their operation of the Provider Defendants was not, and could not have been, known to Liberty Mutual until shortly before it commenced this action.

## VII.    LIBERTY MUTUAL'S JUSTIFIABLE RELIANCE

540.    Claims submitted to Liberty Mutual by the Defendants were verified pursuant to Insurance Law § 403.

541.    To induce Liberty Mutual to promptly pay the Provider Defendants, the Defendants submitted NF-3 or CMS-1500 forms certifying that the Provider Defendants were eligible to be reimbursed.

542.    Further, to induce Liberty Mutual to promptly pay the fraudulent charges for healthcare treatment and tests purportedly provided to Liberty Mutual claimants, the Defendants hired attorneys and law firms to pursue collection of the fraudulent charges from Liberty Mutual. These attorneys and law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Liberty Mutual in the event that the Provider Defendants charges are not promptly paid in full.

543.    Liberty Mutual is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to Liberty Mutual by the Provider Defendants in support of the fraudulent charges, combined with the material misrepresentations described above, were designed to, and did, cause Liberty Mutual to justifiably rely on them.

544.    The Defendants concealed from Liberty Mutual the truth regarding the Provider Defendants reimbursement eligibility.

545.    In reasonable reliance on these misrepresentations, Liberty Mutual paid money to the Provider Defendants to its detriment.

546.    Liberty Mutual would not have paid these monies had the Defendants provided true and accurate information about the Provider Defendants reimbursement eligibility, including

billing for (a) services that were not provided in violation of state and local licensure law; (b) services that involved unlawful referrals and undisclosed financial arrangements; (c) services that were not medically necessary; and, (d) charges that exceeded the amounts allowed under the applicable Fee Schedule.

547.    As a result, Liberty Mutual was caused to make No-Fault payments totaling over $1,466,761.60 to the Provider Defendants. *See* Exhibits 1-2.

548.    Liberty Mutual made payments to the Provider Defendants in reasonable reliance on the documents and representations submitted by the Defendants in support of their no-Fault claims, including the (false) warranties that the Provider Defendants were eligible for payment under New York's No-Fault laws.

## VIII.  <u>DAMAGES</u>

549.    The Defendants' pattern of fraudulent and unlawful conduct injured Liberty Mutual in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Liberty Mutual to calculate its damages with specificity at this stage of the litigation (whereas Liberty Mutual's damages continue to accrue), Liberty Mutual's injury includes, but is not limited to, compensatory damages for:

A.    Payments made to Singh PLLC in connection with No-Fault benefit claims totaling over $1,449,387.42, the exact amount to be determined at trial. The chart annexed at Exhibit 1, and incorporated herein as if set forth in its entirety, identifies Liberty Mutual's payments to the Defendants in connection with No-Fault benefit claims determined to be fraudulent as of the filing of this Complaint.

B.    Payments made to Trinity Medical in connection with No-Fault benefit claims totaling over $17,374.18, the exact amount to be determined at trial. The chart annexed at

Exhibit 2, and incorporated herein as if set forth in its entirety, identifies Liberty Mutual's payments to the Defendants in connection with No-Fault benefit claims determined to be fraudulent as of the filing of this Complaint.

## IX.   CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### SINGH PT PLLC ENTERPRISE
**(Against Gurpreet Singh Ahuja, P.T., Trinity Medical Healthcare Services P.C., and Paula Maude Charisse Brown, M.D.)**

550.    Liberty Mutual re-alleges, re-pleads, and incorporates by reference the allegation set forth in paragraphs 1-549 as if set forth fully herein.

551.    In furtherance of their operation and management of Singh PT PLLC ("Singh PLLC"), Defendants, Gurpreet Singh Ahuja, P.T., Trinity Medical Healthcare Services P.C., and Paula Maude Charisse Brown, M.D. (collectively, "Count I Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Liberty Mutual insurance claims in furtherance of their scheme to defraud.

552.    The Count I Defendants employed two or more mailings to demand and/or receive payment from Liberty Mutual on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 14.

553.    Among other things, NF-3 forms, prescriptions, delivery receipts, wholesale invoices, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Liberty Mutual through the U.S. Mail.

554.    Policies of insurance were delivered to insureds through the U.S. Mail.

555.    Payments made by Liberty Mutual to the Count I Defendants were delivered through the U.S. Mail.

556.    As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms to Liberty Mutual related to services that were purportedly performed by the Provider Defendants for the purpose of collecting payment from Liberty Mutual under the Personal Injury Protection benefits portion of the Liberty Mutual policies and applicable New York No-Fault laws.

557.    As a result of, and in reasonable reliance upon, the mailing of these materially false representations, Liberty Mutual, by its agents and employees, issued drafts to the Provider Defendants, for the benefit of one or more of the Count I Defendants, that would not otherwise have been paid.

558.    The Count I Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents, each appearing legitimate on their face, also prevented Liberty Mutual from discovering this scheme for a long period of time, thus enabling the Count I Defendants to continue without being detected.

559.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

560.    By creating and then mailing to Liberty Mutual (or directing the creation and subsequent mailing to Liberty Mutual) of numerous fraudulent documents in an ingoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

561.    The activities alleged in this case had the direct effect of causing funds to be transferred from Liberty Mutual to Singh PLLC for the benefit of the Count I Defendants.

562.    The Count I Defendants participated in the conduct of the Singh PLLC enterprise through a pattern of racketeering activities.

563.    Liberty Mutual (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York. The insurance fraud scheme practiced here and elsewhere have a deleterious impact on Liberty Mutual's overall financial well-being and adversely affect insurance rates.

564.    Singh PLLC constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

565.    The Count I Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of the Singh PLLC enterprise through a pattern of racketeering activities.

566.    Liberty Mutual is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

567.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

568.    By virtue of the Count I Defendants' violations of 18 U.S.C. 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### SINGH PT PLLC ENTERPRISE
### (Against Gurpreet Singh Ahuja, P.T., Trinity Medical Healthcare Services P.C., and Paula Maude Charisse Brown, M.D.)

569.    Liberty Mutual re-alleges, re-pleads, and incorporates by reference the allegation set forth in paragraphs 1-549 as if set forth fully herein

570.    Throughout their participation and management of Singh PT PLLC ("Singh

PLLC"), Defendants, Gurpreet Singh Ahuja, P.T., Trinity Medical Healthcare Services P.C., and Paula Maude Charisse Brown, M.D. (collectively, "Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

571.    The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Singh PLLC by means of a pattern of racketeering activity, namely using the U.S. Mail to send fraudulent NF-3 bills and other claim-related documents to Liberty Mutual in connection with No-Fault claims, including, without limitation, the numerous instances of mail fraud set forth in Exhibit 14.

572.    The purpose of the conspiracy was to obtain No-Fault benefit payments from Liberty Mutual on behalf of the Provider Defendants, even though the Provider Defendants, as a result of the Count II Defendants' unlawful conduct, were not eligible to collect such No-Fault benefit payments. The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of and mailing of documents and other claim-related materials, including NF-3 forms, containing misrepresentations.

573.    Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make No-Fault payments as a result of the Count II Defendants' unlawful conduct described herein.

574.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Liberty Mutual, and Liberty Mutual is entitled to recover from each of the Count II Defendants three times the damages sustained by reason of the claims submitted by the Provider Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**TRINITY MEDICAL HEALTHCARE SERVICES P.C. ENTERPRISE**
**(Against Singh PT PLLC, Gurpreet Singh Ahuja, P.T., and Paula Maude**
**Charisse Brown, M.D.)**

575.    Liberty Mutual re-alleges, re-pleads, and incorporates by reference the allegation set forth in paragraphs 1-549 as if set forth fully herein.

576.    In furtherance of their operation and management of Trinity Medical Healthcare Services P.C. ("Trinity Medical"), Defendants, Singh PT PLLC, Gurpreet Singh Ahuja, P.T., and Paula Maude Charisse Brown, M.D. (collectively, "Count III Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Liberty Mutual insurance claims in furtherance of their scheme to defraud.

577.    The Count III Defendants employed two or more mailings to demand and/or receive payment from Liberty Mutual on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 15.

578.    Among other things, NF-3 forms, prescriptions, delivery receipts, wholesale invoices, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Liberty Mutual through the U.S. Mail.

579.    Policies of insurance were delivered to insureds through the U.S. Mail.

580.    Payments made by Liberty Mutual to the Count III Defendants were delivered through the U.S. Mail.

581.    As documented above, the Count III Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms to Liberty Mutual related to services that were purportedly performed at locations leased to Trinity Medical so the Defendants could carry out the scheme by collecting payment from Liberty Mutual under the Personal Injury Protection benefits

portion of the Liberty Mutual policies and applicable New York No-Fault laws.

582.    As a result of, and in reasonable reliance upon, the mailing of these materially false representations, Liberty Mutual, by its agents and employees, issued drafts to the Provider Defendants, for the benefit of one or more of the Count III Defendants, that would not otherwise have been paid.

583.    The Count III Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents, each appearing legitimate on their face, also prevented Liberty Mutual from discovering this scheme for a long period of time, thus enabling the Count III Defendants to continue without being detected.

584.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

585.    By creating and then mailing to Liberty Mutual (or directing the creation and subsequent mailing to Liberty Mutual) of numerous fraudulent documents in an ingoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

586.    The activities alleged in this case had the direct effect of causing funds to be transferred from Liberty Mutual to the Provider Defendants for the benefit of the Count III Defendants.

587.    The Count III Defendants participated in the conduct of the Trinity Medical enterprise through a pattern of racketeering activities.

588.    Liberty Mutual (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York. The insurance fraud scheme practiced here and elsewhere have a deleterious impact on Liberty Mutual's overall financial well-being and

adversely affect insurance rates.

589.    Trinity Medical constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

590.    The Count III Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of the Trinity Medical enterprise through a pattern of racketeering activities.

591.    Liberty Mutual is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

592.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Liberty Mutual's injury.

593.    By virtue of the Count III Defendants' violations of 18 U.S.C. 1962(c), Liberty Mutual is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### TRINITY MEDICAL HEALTHCARE SERVICES P.C. ENTERPRISE
### (Against Singh PT PLLC, Gurpreet Singh Ahuja, P.T., and Paula Maude Charisse Brown, M.D.)

594.    Liberty Mutual re-alleges, re-pleads, and incorporates by reference the allegation set forth in paragraphs 1-549 as if set forth fully herein.

595.    Throughout their participation and management of Trinity Medical Healthcare Services P.C. ("Trinity Medical"), Defendants, Singh PT PLLC, Gurpreet Singh Ahuja, P.T., and Paula Maude Charisse Brown, M.D. (collectively, "Count IV Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

596.    The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Trinity Medical by means of a pattern of racketeering activity, namely using the U.S. Mail to send fraudulent NF-3 bills and other claim-related documents to Liberty Mutual in connection with No-Fault claims, including, without limitation, the numerous instances of mail fraud set forth in Exhibit 15.

597.    The purpose of the conspiracy was to obtain No-Fault benefit payments from Liberty Mutual on behalf of the Provider Defendants, even though the Provider Defendants, as a result of the Count IV Defendants' unlawful conduct, were not eligible to collect such No-Fault benefit payments. The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of and mailing of documents and other claim-related materials, including NF-3 forms, containing misrepresentations.

598.    Liberty Mutual has been injured in its business and property by reason of this conspiratorial conduct whereas Liberty Mutual has been induced to make No-Fault payments as a result of the Count IV Defendants' unlawful conduct described herein.

599.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Liberty Mutual, and Liberty Mutual is entitled to recover from each of the Count IV Defendants three times the damages sustained by reason of the claims submitted by Trinity Medical, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT V**
**COMMON LAW FRAUD**
**(Against All Defendants)**

600.    Liberty Mutual re-alleges, re-pleads, and incorporates by reference the allegation set forth in paragraphs 1-549 as if set forth fully herein.

601.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual, and also concealed material facts from Liberty Mutual during the course of this scheme and in the course of their submission of bills seeking payments for medical services under New York's No-Fault laws.

602.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (a) services that were not provided in violation of state and local licensure law; (b) services that involved unlawful referrals and undisclosed financial arrangements; (c) services that were not medically necessary; and, (d) charges that exceeded the amounts allowed under the applicable Fee Schedule, when, in fact, the Provider Defendants were not eligible to seek or collect No-Fault benefit payments for these services because they were medically unnecessary.

603.    The Defendants intentionally made the above-described false and fraudulent statements, and purposely concealed material facts for the purpose of inducing Liberty Mutual to pay charges submitted by (or on behalf of) the Provider Defendants.

604.    Liberty Mutual reasonably relied, to its detriment, upon the Defendants' material misrepresentation.

605.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct because Liberty Mutual has made No-Fault payments to the Provider Defendants totaling in excess of $1,466,761.60 over in connection with No-Fault claims determined to be fraudulent as of the filing of this action.

**COUNT VI**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

606.    Liberty Mutual re-alleges, re-pleads, and incorporates by reference the allegation set forth in paragraphs 1-549 as if set forth fully herein.

607.    As detailed above, the Defendants have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of Liberty Mutual.

608.    The Defendants have each been enriched at Liberty Mutual's expense through their receipt of payments made by Liberty Mutual in connection with No-Fault benefit claims submitted by (or on behalf of) the Provider Defendants.

609.    The payments received by the Defendants constituted a benefit that they willingly and voluntarily accepted despite their commission of improper, unlawful, and unjust acts in furtherance of this scheme. The Defendants' retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

610.    By reason of the improper, unlawful, and unjust conduct described throughout this Complaint, the Defendants have been unjustly enriched in an amount totaling in excess of $1,466,761.60, the exact amount to be determined at trial.

**COUNT VII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Singh PT PLLC and Trinity Medical Healthcare Services P.C.)**

611.    Liberty Mutual re-alleges, re-pleads, and incorporates by reference the allegation set forth in paragraphs 1-549 as if set forth fully herein.

612.    Medical providers must adhere to all applicable New York statutes which grant the authority to provide medical services in New York to be eligible to collect assigned No-Fault benefits.

613.    In view of its billing for healthcare treatment and testing that were (a) not provided in violation of state and local licensure law; (b) pursuant to unlawful referrals and undisclosed financial arrangements; (c) not medically necessary; and, (d) billed in excess of the amounts allowed under the applicable Fee Schedule, the Provider Defendants have, at all relevant times,

been operating in violation of one or more New York or local licensing requirements necessary to provide professional medical services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus have no standing to seek or collect any No-Fault benefit payments from Liberty Mutual, including, but not limited to, No-Fault benefits that were assigned to the Provider Defendants by its patients.

614.    The Provider Defendants continue to submit assigned No-Fault claims to Liberty Mutual demanding payment, and other assigned No-Fault claims remain pending with Liberty Mutual.

615.    The Provider Defendants continue to challenge Liberty Mutual's prior claim denials.

616.    The Provider Defendants continue to commence litigation against Liberty Mutual seeking payment of No-Fault benefits allegedly due and owing.

617.    A justifiable controversy exists between Liberty Mutual and the Provider Defendants because the Provider Defendants reject Liberty Mutual's ability to deny such claims.

618.    Liberty Mutual has no adequate remedy at law.

619.    The Provider Defendants will also continue collecting No-Fault payments from Liberty Mutual absent a declaration by this Court that their activities are unlawful, and that Liberty Mutual has no obligation to pay the pending, previously-denied, and/or any future No-Fault claims submitted by the Provider Defendants.

620.    Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring that the Provider Defendants, at all relevant times, (a) services that were not provided in violation of state and local licensure law; (b) services

that involved unlawful referrals and undisclosed financial arrangements; (c) services that were not medically necessary; and, (d) charges that exceeded the amounts allowed under the applicable Fee Schedule, and thus has no standing to collect payment on any assigned No-Fault claim.

## X.    **DEMAND FOR RELIEF**

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### SINGH PT PLLC ENTERPRISE
**(Against Gurpreet Singh Ahuja, P.T., Trinity Medical Healthcare Services P.C., and Paula Maude Charisse Brown, M.D.)**

(a)  AWARD Liberty Mutual's actual and consequential damages to be established at trial;

(b)  AWARD Liberty Mutual's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorney's fees;

(c)  GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

### COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### SINGH PT PLLC ENTERPRISE
**(Against Gurpreet Singh Ahuja, P.T., Trinity Medical Healthcare Services P.C., and Paula Maude Charisse Brown, M.D.)**

(a)  AWARD Liberty Mutual's actual and consequential damages to be established at trial;

(b)  AWARD Liberty Mutual's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorney's fees;

(c)  GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### TRINITY MEDICAL HEALTHCARE SERVICES P.C. ENTERPRISE
### (Against Singh PT PLLC, Gurpreet Singh Ahuja, P.T., and Paula Maude Charisse Brown, M.D.)

(a) AWARD Liberty Mutual's actual and consequential damages to be established at trial;

(b) AWARD Liberty Mutual's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### TRINITY MEDICAL HEALTHCARE SERVICES P.C. ENTERPRISE
### (Against Singh PT PLLC, Gurpreet Singh Ahuja, P.T., and Paula Maude Charisse Brown, M.D.)

(a) AWARD Liberty Mutual's actual and consequential damages to be established at trial;

(b) AWARD Liberty Mutual's treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorney's fees;

(c) GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d) GRANT all other relief this Court deems just.

**COUNT V**
**COMMON LAW FRAUD**
**(Against All Defendants)**

(a) AWARD Liberty Mutual its actual damages in an amount to be determined at trial;

(b) AWARD Liberty Mutual its costs, including, but not limited to; investigative costs incurred in the detection of Defendants' illegal conduct;

(c) AWARD Liberty Mutual its costs in defending collection lawsuits and arbitrations filed by the Defendants seeking to collect payment in connection with false and fraudulent No-Fault claims; and

(d) GRANT any other relief this Court deems just.

**COUNT VI**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

(a) AWARD Liberty Mutual its actual damages in an amount to be determined at trial; and

(b) GRANT any other relief this Court deems just.

**COUNT VII**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against Singh PT PLLC and Trinity Medical Healthcare Services P.C.)**

(a) DECLARE that Singh PT PLLC and Trinity Medical Healthcare Services P.C., at all relevant times, have been operated in violation of at least one New York state and/or local licensing requirement necessary to provide and bill for healthcare services in New York;

(b) DECLARE that Singh PT PLLC and Trinity Medical Healthcare Services P.C.'s activities are unlawful;

(c) DECLARE that Liberty Mutual has no obligation to pay pending, previously-denied and/or future No-Fault insurance claims submitted by Singh PT PLLC and Trinity Medical Healthcare Services P.C.; and

(d) GRANT all other relief this Court deem just and appropriate.

## <u>JURY TRIAL DEMAND</u>

The Plaintiffs demand a trial by jury on all claims.

KING, TILDEN, MCETTRICK & BRINK, P.C.

*/s/ Shauna L. Sullivan*
_____
Nathan A. Tilden (NT0571)
ntilden@ktmpc.com
Shauna L. Sullivan (SS5624)
ssullivan@ktmpc.com
350 Granite St, Ste 2204
Braintree, MA 02184
(617) 770-2214

Attorneys for the Plaintiffs,
*LM Insurance Corporation,*
*Liberty Mutual Fire Insurance Company,*
*Liberty Mutual Personal Insurance Company,*
*LM General Insurance Company,*
*American States Insurance Company,*
*Liberty County Mutual Insurance Company, and*
*Wausau Underwriters Insurance Company*

Dated: October 22, 2024